In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3455

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MASAO FUJII, a/k/a YASUO TAMURA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 17—**Joan B. Gottschall**, *Judge.*

ARGUED APRIL 9, 2002—DECIDED AUGUST 20, 2002

Before FLAUM, *Chief Judge*, and COFFEY and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Masao Fujii was convicted of attempting to smuggle aliens into the United States for private financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) ("Count 1"); of encouraging and inducing aliens to come to, enter, or reside in the United States, knowing that it was in violation of law, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) ("Count 2"); and finally, of knowingly using a counterfeit passport, in violation of 18 U.S.C. § 1543 ("Count 3"). The district court sentenced Fujii to 36 months of imprisonment. On appeal, Fujii challenges his conviction with respect to Counts 1 and 2, arguing that the district court erroneously admitted evidence under the

business records exception to the rule against hearsay and that the evidence the government produced at trial was insufficient to support his convictions.

## I.  Background

On January 5, 2000, Masao Fujii and three Chinese nationals used fraudulent passports to board a Korean Airlines Flight in Saigon, Vietnam bound for Seoul, Korea. Fujii's fraudulent passport bore the name "Yasuo Tamura." Xie Mei Zheng, Yan Zhu Zheng, and Xiao Hong Li used fraudulent passports bearing the names "Naoko Yamada," "Miyuki Okamoto," and "Yuri Kimura," respectively. The next day, all four individuals checked through onto Korean Airlines Flight 37 in Seoul, Korea bound for Chicago's O'Hare International Airport.

Flight 37 arrived at O'Hare's international terminal, Terminal 5, where the United States Immigration and Naturalization Service ("INS") checks passports and other documentation. The process for checking passports and documentation at Terminal 5 proceeds as follows: First, the traveler presents documentation at a primary inspection station. If the documentation appears incorrect or for some other reason requires further inspection, the traveler is referred to an INS secondary inspection station for further questioning.

Fujii approached the INS primary inspection station alone. There, he presented INS Inspector Todd Seeger with his fraudulent Japanese passport, his INS I-94 W Nonimmigrant Visa Waiver Arrival/Departure Form, and a Customs Declaration Form. Because Seeger noticed that Fujii's passport did not contain the security features that he was accustomed to seeing on Japanese passports, Seeger referred Fujii to the INS secondary inspection station.

At the same time that Fujii was being referred to the INS secondary inspection station, Supervisory INS Inspector Peter Manno was monitoring the other individuals arriving on Flight 37. Manno watched the three Chinese Nationals enter the women's restroom. Manno stood outside the restroom and refused to let anyone else enter. After hearing six distinct toilet flushes, Manno and INS Supervisor Teresa Guerrero entered the restroom and confronted the three women. Two of the women were standing together in one of the bathroom stalls, floating in that stall's toilet were the remnants of two Japanese passports bearing the names "Okamoto" and "Yamada." The third Chinese national was in an adjacent stall and had no passport in her possession, and no remnants were seen floating in the toilet in that stall. All three of the women were then escorted to the INS secondary inspection station.

At the INS secondary inspection station, Manno contacted Korean Airlines and requested a copy of the manifest for Flight 37 and a copy of passenger reservations for "Okamoto" and "Yamada." Korean Airlines Assistant Manager Tracy Oliveras printed out passenger reservations, check-in records, and the manifest for the flight. The records were kept in a computer system and manifests were printed by Oliveras on a daily basis. Either travel agents, airline reservation agents, or airline agents stationed at the airport had recorded the relevant information in the computer system. Further, Oliveras testified that the entries were made at or near the time the information was received, it was the regular business practice of Korean Airlines to make the entries into the computer system, and the records were kept as part of Korean Airlines' regular business activity.

The Korean Airlines check-in records revealed that "Tamura" and the three Chinese nationals all "through checked" from Saigon to Flight 37 in Seoul. Further, all four

individuals checked in with the same airline agent within minutes of one another. Finally, the check-in records showed that "Yamada" was in a group of four. Without about being asked to do so, Oliveras subsequently pulled the records for the other individuals listed in the group of four with "Yamada." The other individuals listed were "Tamura," "Okamoto," and "Kimura." Korean Airlines reservations records further showed that all four individuals had booked their reservations with the same travel agent and that the tickets were all issued on the same day and paid for by the same company.

While Manno obtained the aforementioned flight information, INS agent Liam O'Neill began interviewing Fujii at the INS secondary inspection station with the assistance of Language Services, a contract company that INS used to provide interpreters via telephone. O'Neill asked Fujii questions in English that were then translated into Japanese by the Language Services telephone interpreter. Then Fujii answered the questions in Japanese, and the interpreter translated Fujii's answers back into English. About half-way through the interview, Korean Airlines Manager, Man Kee Ha, took over the translating duties for the telephone interpreter from Language Services.

After Ha began interpreting, Fujii proceeded to give two separate sworn statements. In his first sworn statement, Fujii insisted that he was "Tamura" and that his passport was legally issued by the Japanese government. Following giving this first sworn statement, however, O'Neill fingerprinted Fujii and placed his prints in the INS's fingerprint Identification System ("IDENT"). O'Neill then learned that Fujii had previously pled guilty and was convicted of encouraging or inducing six Chinese aliens to enter the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). O'Neill then began to interview Fujii for a second time. At this point, Fujii admitted that the purpose of his trip was to help the "Singapore guy" to bring

the three Chinese women through United States Immigration. Further, Fujii explained that he did this because he had guaranteed a debt for a friend, Sasaki Takeshi, to the Cambodian mafia. Fujii then signed a second sworn statement, which contained the information above, using his real name, Masao Fujii.

Following the government's presentation of the aforementioned evidence at trial, Fujii moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court denied Fujii's motion with regard to Counts 2 and 3, but reserved ruling with regard to Count 1. Following the presentation of his case at trial, Fujii renewed his motion for judgment of acquittal with regard to Count 1, which the district court denied. The jury found Fujii guilty on all three counts in the indictment.

On appeal, Fujii contends that the district court erred when it admitted into evidence check-in and reservation records under the business records exceptions to the bar on the admission of hearsay. Fujii also appeals the denial of his motion for judgment of acquittal, challenging the sufficiency of the government's evidence with respect to Counts 1 and 2, arguing (1) that the government failed to prove that he "encouraged or induced" the aliens or that he did these acts for "private financial gain," (2) that the translated version of his second sworn statement is untrustworthy, and (3) that the government failed to provide sufficient, independent evidence to corroborate his sworn statement.

## II. Analysis

### A. *Business Records Exception*

Fujii argues that the district court erred in admitting Korean Airlines' check-in and reservation records because

they were not made in the ordinary course of business and because they did not contain sufficient indicia of trustworthiness. We review a district court's evidentiary ruling for an abuse of discretion. *See United States v. Briscoe*, 896 F.2d 1476, 1494-95 (7th Cir. 1990).

Federal Rule of Evidence 803(6) provides for the admission of

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the *printouts* themselves are not kept in the ordinary course of business. *See Briscoe*, 896 F.2d at 1494 n.13.

In this case, the check-in and reservation records were compiled and maintained in Korean Airlines' ordinary course of business. Oliveras, Korean Airlines Assistant Manager, testified that the records were made from information transmitted from a person with knowledge, the entries were made at or near the time the information was received, it was the regular business practice of Korean Airlines to make the entries into the computer system, and the records were kept as part of Korean Airlines' regular business activity. Because the information was printed out at the request of the INS does not deprive the printouts of its business-record character. *See id.*

Consequently, because Fujii fails to establish that "the source of information or the method or circumstances of preparation indicate lack of trustworthiness," *see* FED. R. EVID. 803(6), we conclude that the district court did not abuse its discretion in admitting check-in and reservation records under Rule 803(6).

## B.  Sufficiency of the Evidence

A district court's denial of a motion for acquittal is reviewed *de novo. See United States v. Quilling*, 261 F.3d 707, 712 (7th Cir. 2001). We review the evidence and draw all reasonable inferences therefrom in the light most favorable to the government. *See United States v. Jackson*, 103 F.3d 561, 567 (7th Cir. 1996). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the district court must be affirmed. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

Fujii argues that the evidence at trial was insufficient to convict him of Counts 1 and 2. Specifically, Fujii contends that the government failed to prove that he acted for the purpose of "private financial gain" or that he "encouraged or induced" the aliens. To convict on Count 1, the government needed to establish that Fujii attempted to bring the three Chinese nationals to the United States for the purpose of private financial gain, knowing or in reckless disregard of the fact that the three Chinese nationals had not received prior official authorization to enter the United States. *See* 18 U.S.C. § 1324(a)(2)(B)(ii). A pecuniary motive sufficiently establishes that one acted for the purpose of "private financial gain." *See United States v. Tsai*, 282 F.3d 690, 697 (9th Cir. 2002). To convict on Count 2, the government needed to establish that Fujii encouraged or induced the three Chinese nationals to enter the United States, knowing or in reckless disre-

gard of the fact that such entry was in violation of law. *See* 18 U.S.C. § 1324(a)(1)(A)(iv). To prove that Fujii "encouraged or induced" the aliens, all that the government needed to establish was that Fujii knowingly helped or advised the aliens. *See United States v. He*, 245 F.3d 954, 957-59 (7th Cir. 2001) (approving jury instruction equating knowingly helped or advised with "encouraged").

The following evidence was adduced against Fujii at trial: Fujii admitted in his second sworn statement that he was assisting a man to bring the three Chinese nationals through United States Immigration and that he was doing these acts because he had guaranteed a debt for a friend to the Cambodian mafia. Further, the government entered evidence that Fujii had previously pled guilty to a similar crime giving an identical explanation for his acts, establishing that Fujii knew that his acts were in violation of the law. *See* FED. R. EVID. 404(b). Moreover, the government offered evidence that all four individuals, including Fujii, attempted to use fraudulent passports to enter the United States; that Fujii and the three Chinese nationals reserved their tickets together; that they purchased their tickets together; that they had their tickets issued sequentially; and finally, that they checked in to their flight together. The government also presented evidence that upon their arrival in Chicago, the three Chinese nationals were discovered attempting to dispose of their fraudulent passports in the women's washroom.

Taken in the light most favorable to the government, the aforementioned evidence was more than sufficient to convict Fujii on both counts. Fujii himself admitted that he was helping a man bring the three Chinese nationals through United States Immigration. This fact established that Fujii "encouraged or induced" the aliens. *See He*, 245 F.3d at 957-59. Fujii also admitted that he did these acts because of a mafia debt, satisfying the pecuniary motive element of Count 1. *See Tsai*, 282 F.3d at 697.

In further support of his insufficiency claim, Fujii argues that because the linguistic skills of Korean Airlines employee Man Kee Ha were so deficient, his translated sworn statement should have been disregarded.[1] However, it is not our job to determine whether Ha's translated version of Fujii's sworn statement should be disregarded, rather it is "the function of the finder-of-fact to weigh the evidence presented by the parties as to the accuracy of the proffered translation and to determine the reliability of the translation on the basis of that evidence." *United States v. Zambrana*, 841 F.2d 1320, 1337 (7th Cir. 1988). Fujii challenged Ha's linguistic abilities on cross-examination and attempted to demonstrate to the jury why it should have found Ha's translations untrustworthy, and the jury was not convinced. Thus, we decline to second-guess this credibility determination on appeal. *See United States v. Wimberly*, 79 F.3d 673, 676 (7th Cir. 1996) ("Where a sufficiency of the evidence challenge is based on witness credibility, we defer to the jury's determination absent 'extraordinary circumstances.'").

Finally, Fujii contends that his second sworn statement should have been disregarded because the government failed to present sufficient, independent evidence to corroborate this sworn statement. In *Jackson*, the defendant argued that because the only evidence adduced at trial to establish the "agreement" necessary for a conspiracy came from his own statement, the government's evidence did not independently establish an "agreement," and therefore, there was insufficient evidence to sustain his conviction. *See* 103 F.3d at 567. In response, we explained:

> In this circuit, when an appellant challenges the sufficiency of the evidence, alleging that the conviction

---

[1] Notably, Fujii does not allege that the district court erred in admitting Ha's translation nor does he challenge Ha's qualifications.

was based solely on his own statements, we will up-
hold the conviction if there is substantial independent
evidence which would tend to establish the *trustworthi-
ness* of the statement . . . . [E]stablishing such trustwor-
thiness does not require *independent* proof of *each
element* of the offense charged.

*Id.* (citations and quotations omitted) (emphasis in origi-
nal). In other words, all that is necessary is for the gov-
ernment to present "extrinsic evidence tending to corrob-
orate the confession, [and then] the confession as a whole
is admissible, and some elements of the offense may be
proven entirely on the basis of [the] corroborated confes-
sion." *United States v. Trombley*, 733 F.2d 35, 38 (6th Cir.
1984). Fujii's argument overstates the extent of independ-
ent evidence necessary to corroborate his sworn statement.
As demonstrated in our analysis above, the government
presented more than sufficient evidence to corroborate
Fujii's sworn statement, including evidence that all four
individuals reserved and purchased their tickets togeth-
er, evidence that all four individuals used fraudulent
Japanese passports, and evidence that the three Chi-
nese nationals were attempting to dispose of their fraud-
ulent passports upon their arrival in the United States.

## III.  Conclusion

For the foregoing reasons, we AFFIRM.

A true Copy:

       Teste:

                    ————————————————————
                    *Clerk of the United States Court of
                    Appeals for the Seventh Circuit*