# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2974

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District of |
| | * | Minnesota. |
| Donald Ray Tate, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 12, 2010
Filed: March 1, 2011

_____

Before RILEY, Chief Judge, JOHN R. GIBSON[1] and MURPHY, Circuit Judges.

_____

RILEY, Chief Judge.

Donald Ray Tate appeals his conviction, after a jury trial, for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Tate argues there is insufficient evidence to support his conviction and, in the alternative, he is entitled to a new trial because the government withheld material impeachment evidence. Tate also challenges his mandatory minimum fifteen-year prison sentence. We affirm.

_____

[1]The Honorable John R. Gibson retired from service on this court on January 26, 2011. This opinion is consistent with his vote at the panel's conference following oral argument on May 12, 2010. See also 8th Cir. Rule 47E.

## I.   BACKGROUND

### A.   Facts[2]

In the early hours of October 4, 2007, the St. Paul Police Department (SPPD) received a report of an assault at the Luxor Lounge.  The police often had received calls to investigate reports of gunshots, public urination and sex, illegal narcotics, and theft at the Luxor bar.  SPPD officers repeatedly chastised the Luxor's security staff for failing to wand patrons with a handheld metal detector or to check their identification.

Six or seven police officers responded to the October 4 assault report.  When the officers arrived, they found an agitated crowd of twenty or thirty people standing outside.  The officers went inside the Luxor, where they found a man who had been hit with a beer bottle.

Several uniformed officers escorted the victim outside to a waiting ambulance.  A plainclothes officer, Officer Adam Siegfried, walked ten yards behind them.  Siegfried was training one of the uniformed officers and attempting to monitor his actions *incognito*.

As Officer Siegfried left the Luxor, he immediately noticed Tate.  Tate "was out of place," and acting "really weird."  Officer Siegfried saw Tate standing by himself, "staring intently at the officers" instead of the raucous crowd.  As soon as the officers turned away from Tate and toward the waiting ambulance, Tate ran into an adjacent alley.  No one else ran away from the bar.

---

[2]We recite the facts in the light most favorable to the jury's verdict, affording the government all reasonable inferences.  See United States v. Bordeaux, 570 F.3d 1041, 1047 (8th Cir. 2009).

Officer Siegfried watched Tate run 30 to 40 yards to a residence at the end of the alleyway. The alleyway was well lit, because the residence's owner had installed a motion-detecting light. Officer Siegfried never lost sight of Tate, who stopped behind the residence's garage. Tate was standing approximately 55 yards from Officer Siegfried's vantage-point.

Officer Siegfried saw Tate kneel down next to a residential garbage can and place something near it. Tate "went down on his right knee," moved "his left shoulder" up and down with "his left arm tilting," "definitely placing something around the garbage can." Although the garbage can obscured approximately 75% of Tate's body from Officer Siegfried's view, Officer Siegfried's vantage-point was otherwise unobstructed. After "approximately five to six seconds" on his knee, Tate stood up and walked back toward the Luxor.

Officer Siegfried was certain Tate had placed something near the garbage can. Officer Siegfried asked Officer Franklin Judge to detain Tate. Officer Judge intercepted Tate before Tate returned to the Luxor.

Officer Siegfried immediately walked to the garbage can. Behind the garbage can—between the can and the residence's garage—Officer Siegfried saw a brown jersey glove, also known as a "brownie." Officer Siegfried knelt down and saw the brown handle of a handgun protruding from underneath the brownie.

Officer Siegfried was not surprised to find a handgun under the brownie. In Officer Siegfried's experience, "people that would normally carry brownies carry them for a reason." Officer Siegfried "usually" finds handguns near brownies, because people who carry brownies "don't want to transfer their identifiers, whether it be fingerprints or DNA, to a particular weapon."

Subsequent forensic analysis revealed the handgun was a loaded Smith and Wesson, model 66, .357 revolver. The firearm was stolen and bore the description "Minnesota State Patrol."

No identifiable fingerprints were found on either the firearm or the brownie. An expert witness testified at Tate's trial that it would have been somewhat unusual to find identifiable fingerprints because of how firearms are designed and handled.

A DNA expert testified a DNA mixture was found on the firearm, but Tate's DNA was not present in this mixture. At least three commingled DNA profiles were found on the brownie. While 74% of African-Americans, 83% of Native Americans, 81% of Hispanics, and 77% of Caucasians could be excluded from the commingled DNA profiles, Tate's DNA could not be excluded from the mix.

### B.     Prior Proceedings

In February 2008, a grand jury returned an indictment charging Tate with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The grand jury alleged Tate had at least three prior convictions for "a violent felony or a serious drug offense" as set forth in 18 U.S.C. § 924(e)(2)(A) and (B). Accordingly, Tate was subject to the fifteen-year mandatory minimum sentence for armed career criminals set forth in the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e).

In December 2008, the district court[3] presided over a three-day jury trial. The jury found Tate guilty. At the close of the government's case-in-chief, Tate moved for a judgment of acquittal under Fed. R. Crim. P. 29, arguing the government had adduced insufficient evidence to prove he knowingly possessed the firearm. The district court denied Tate's Rule 29 motion.

---

[3]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

In February 2009, Tate moved for a new trial under Fed. R. Crim. P. 33. Tate alleged the government failed to disclose material impeachment evidence, in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963) and Giglio v. United States, 405 U.S. 150, 153-55 (1972). Tate asserted the government should have apprised him before trial that Officer Siegfried was involved in an altercation while off-duty and attending a SPPD holiday party in January 2008. In July 2009, after holding a hearing and reviewing the disputed evidence and Officer Siegfried's personnel file *in camera*, the district court denied Tate's Rule 33 motion.

In August 2009, the district court sentenced Tate to fifteen years imprisonment. The court held Tate was subject to ACCA's fifteen-year mandatory minimum because Tate had at least three predicate convictions for violent felonies or serious drug offenses. Tate appeals his conviction and sentence.

## II.    DISCUSSION

Tate argues (1) there was insufficient evidence to support his § 922(g)(1) conviction, and the district court erred in denying his Rule 29 motion; (2) the government failed to disclose Officer Siegfried's altercation before Tate's trial, and the district court erred in denying Tate's Rule 33 motion; and (3) Tate did not have at least three predicate convictions for violent felonies or serious drug offenses, and the district court erred in holding Tate was subject to ACCA's fifteen-year mandatory minimum sentence.

### A.    Rule 29 Motion: Sufficiency of the Evidence
#### 1.    Standard of Review

Although we review the district court's denial of a motion for judgment of acquittal de novo, United States v. Rush-Richardson, 574 F.3d 906, 909 (8th Cir. 2009), the underlying standard of review is deferential to the jury's verdict. "We reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Morales, 445 F.3d 1081, 1084 (8th Cir. 2006)

(internal marks omitted). We must "view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." United States v. Milk, 447 F.3d 593, 598 (8th Cir. 2006). "A conviction may be based on circumstantial as well as direct evidence. The evidence need not exclude every reasonable hypothesis except guilt." United States v. Erdman, 953 F.2d 387, 389 (8th Cir. 1992) (citations omitted). "The standard for reviewing a claim of insufficient evidence is strict, and a jury's guilty verdict should not be overturned lightly." United States v. Pizano, 421 F.3d 707, 719 (8th Cir. 2005).

### 2.    Analysis

The district court did not err in denying Tate's Rule 29 motion for judgment of acquittal. The evidence in the record supports the jury's verdict.

To sustain a § 922(g)(1) conviction, the government was required to prove "(1) a prior felony conviction; (2) knowing possession of a firearm; and (3) an interstate nexus." United States v. Jones, 266 F.3d 804, 813 (8th Cir. 2001). Tate stipulated to the first and third elements. The disputed issue was whether Tate possessed the firearm that Officer Siegfried found next to the garbage can.

On appeal, Tate maintains the evidence the government adduced at his trial was too speculative to support a reasonable inference that he possessed the firearm. Tate stresses his fingerprints and DNA were not found on the firearm. Tate also emphasizes no one testified to seeing Tate with a firearm. Further, one of Tate's friends, Vernisha Henderson, testified Tate never left the Luxor's parking lot before his arrest. Henderson and Tate's younger sister, Dominique Tate (Dominique), also testified (1) the Luxor's security staff used their metal detecting wands on entering bar patrons, and (2) Tate had entered the bar on the night in question. Finally, Tate opines there are good reasons why the jury should have disbelieved Officer Siegfried's testimony that he could see Tate place something near the garbage can from Officer Siegfried's vantage-point.

The jury—as the "final arbiter" of witness credibility—was free to believe Officer Siegfried and disbelieve Henderson and Dominique. See United States v. Wilder, 597 F.3d 936, 944 (8th Cir. 2010) ("final arbiter"); United States v. Aguilar-Portillo, 334 F.3d 744, 747 (8th Cir. 2003) (discussing jury's role in assessing credibility). And under governing precedent, Officer Siegfried's testimony was sufficient in itself to support the jury's finding that Tate knowingly possessed the firearm. See United States v. Rankin, 902 F.2d 1344, 1345-46 (8th Cir. 1990) (deciding there was sufficient evidence to support the defendant's § 922(g)(1) conviction because officers testified the defendant "dropped a dark object to the ground and that, after immediately running to the spot where the object fell, one of the officers retrieved a dark gun from that location"); cf. United States v. Haney, 23 F.3d 1413, 1416-17 (8th Cir. 1994) (deciding a lack of fingerprint evidence on a firearm or any other physical evidence was not fatal to a § 922(g)(1) conviction in part because a witness testified he saw the defendant drop what appeared to be a firearm onto a truck seat where an officer later discovered a gun). The DNA mixture evidence found on the brownie, when considered in light of Tate's status as a felon and Officer Siegfried's testimony about the purpose of brownies, strengthened the government's case.

### B.    Rule 29 Motion: Exculpatory Evidence
#### 1.    Standard of Review

A district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The district court's discretion in this regard "is quite broad," United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002), and we review only for an abuse of such discretion, United States v. Peters, 462 F.3d 953, 957 (8th Cir. 2006). Reversal of a denial of a motion for new trial is rare.

#### 2.    Analysis

"In Brady, the Supreme Court stated that 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" United States v. Keltner, 147 F.3d 662, 673 (8th Cir. 1998) (quoting Brady, 373 U.S. at 87). "To establish a Brady violation, a defendant is required to show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." Id.

"To establish materiality in the context of Brady, 'the accused must show there is a reasonable probability that if the allegedly suppressed evidence had been disclosed at trial the result of the proceeding would have been different.'" Id. (quoting Drew v. United States, 46 F.3d 823, 827-28 (8th Cir. 1995)). "A reasonable probability is a probability sufficient to undermine the reviewing court's confidence in the outcome of the proceeding." Id. (internal marks omitted).

Even if we assume the government suppressed evidence regarding Officer Siegfried's altercation at the SPPD's holiday party and such evidence was favorable to Tate, Tate's Brady claim fails because he cannot show materiality. In other words, Tate cannot demonstrate there is a reasonable probability the result of his trial would have been different if the allegedly suppressed evidence had been disclosed. Tate cannot make such a showing because the allegedly suppressed evidence was almost entirely inadmissible.

The subject evidence is as follows. In January 2008, Officer Siegfried was involved in an off-duty altercation with a bartender while attending a SPPD holiday party. The bartender, who was not working at the time, alleged Officer Siegfried punched him in the face and kicked him. In response to interrogation by law enforcement officers, Officer Siegfried repeatedly maintained (1) the bartender was drunk; (2) Officer Siegfried only pushed the bartender in order to stave off the

bartender's attempt to fight; and (3) the bartender fell and bit his tongue after the push.[4]

The parties agree the only rule of evidence at issue is Fed. R. Evid. 608(b), which provides:

> **Specific instances of conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Tate argues that, had the government disclosed before trial the allegedly suppressed evidence, at trial Tate would have been entitled under Fed. R. Evid. 608(b) to ask Officer Siegfried on cross-examination "whether an allegation had been made against him; inquire into the nature of the allegation; who made it and when; and the current status and details of any investigation" because "[t]he fact that the Minneapolis City Attorney's Office ultimately brought charges . . . confirms that the State did not believe Officer Siegfried" when he denied punching and kicking the bartender.

Tate misunderstands Rule 608(b). The fact Officer Siegfried may have assaulted the bartender is not probative of Officer Siegfried's character for

---

[4]In January 2009, after Tate was convicted, the Minneapolis City Attorney charged Officer Siegfried with four counts of misdemeanor assault and one count of misdemeanor disorderly conduct. A state court jury later found Officer Siegfried not guilty of the assault charges but guilty on the disorderly conduct charge. Officer Siegfried was sentenced to one year of probation, community service, restitution, and a $100 fine.

truthfulness, so any extrinsic evidence tending to show Officer Siegfried assaulted the bartender would not be admissible.  Fed. R. Evid. 608(b); cf. United States v. Lamb, 99 F. App'x 843, 847 (10th Cir. 2004) ("[M]ere assault does not impugn a witness's credibility."); United States v. Key, 40 F. App'x 545, 547 (9th Cir. 2002) (unpub. mem. op.) (concluding the district court did not abuse its discretion in excluding evidence that an adverse witness in the defendant's drug trafficking prosecution had been arrested for domestic violence and was a suspect in a murder case).

Even if we assume Rule 608(b) would have permitted Tate to ask Officer Siegfried on cross-examination whether Officer Siegfried lied when he stated he did not punch and kick the bartender, Officer Siegfried more than likely would have denied the accusation.   Officer Siegfried had not yet been charged and had consistently denied assaulting anyone. Unable to introduce extrinsic evidence to rebut Officer Siegfried's denial, Tate's inquiry necessarily would have ended.  See, e.g., Miller v. United States, 135 F.3d 1254, 1256 (8th Cir. 1998) ("The court did not err because extrinsic evidence of a witness's prior bad acts cannot be used to impeach, and cross-examination is limited to only those acts that are probative of the propensity for truthfulness."); United States v. Nazarenus, 983 F.2d 1480, 1486 (8th Cir. 1993) ("Rule 608(b) . . . specifically prohibits [proof of prior bad acts], stating that '[s]pecific instances of conduct of a witness, for the purpose of . . . attacking the witness' credibility, . . . may not be proved by extrinsic evidence.'").

In any event, Rule 608(b), much like Rule 29, is a rule of discretion.  See United States v. Goings, 313 F.3d 423, 427 (8th Cir. 2002).  In its oral statements at the hearing on Tate's motion for a new trial, the district court indicated it probably would not have permitted Tate to impeach Officer Siegfried on remote collateral matters such as the alleged bar fight at the SPPD holiday party in January 2008—even if such impeachment evidence were admissible under Rule 608(b). See also Fed. R. Evid. 403.

The district court did not abuse its discretion in denying Tate's motion for new trial.

### C.     ACCA: Three Qualifying Predicate Convictions

#### 1.     Standard of Review

"We review de novo a district court's determination that a defendant's prior conviction constitutes a [qualifying predicate conviction] for the purposes of § 924(e)." United States v. Jones, 574 F.3d 546, 549 (8th Cir. 2009) (quoting United States v. Boaz, 558 F.3d 800, 806 (8th Cir. 2009)).

#### 2.     Analysis

Section 924(e)(1) imposes a mandatory minimum fifteen-year sentence if a defendant convicted of violating § 922(g)(1) has three prior convictions for a "violent felony" or a "serious drug offense." See United States v. Stymiest, 581 F.3d 759, 767 (8th Cir. 2009) (discussing 18 U.S.C. § 924(e)(1)).  Tate has four convictions that could qualify as predicate convictions under § 924(e): (1) a 2003 conviction for Aggravated Robbery in the First Degree, in violation of Minn. Stat. § 609.222; (2) two 2005 convictions for Sale of Controlled Substances in the Third Degree, in violation of Minn. Stat. §§ 152.023 and 609.05; and (3) one 2005 conviction for Sale of Controlled Substances in the Third Degree in a School Zone, in violation of Minn. Stat. § 152.022.

Tate contends his three 2005 drug dealing convictions should only count as a single predicate "serious drug offense" under § 924(e)(1), because they were "one criminal episode."  Tate argues § 924(e)(1) requires qualifying predicates be "committed on occasions different from one another."  Tate explains the three sales of crack cocaine underlying his 2005 drug dealing convictions were discovered during "Operation Sunrise," the SPPD's lengthy investigation of the Gangster Disciples in 2002.  Operation Sunrise involved live police and video surveillance of some of St. Paul's most notorious street corners for drug dealing.  Tate's 2005 drug dealing

-11-

convictions all involved the same confidential informant, concerned the same geographic area of St. Paul, and stemmed from a single criminal complaint. In pleading guilty, Tate admitted he sold the confidential informant (1) $20 worth of crack cocaine on July 29, 2002; (2) $100 worth of crack cocaine on August 22, 2002; and (3) an unknown quantity of crack cocaine within 300 feet of a school on August 23, 2002.

Tate concedes we have held, in a series of cases, that convictions for discrete drug transactions on different dates count as separate predicate offenses for purposes of § 924(e)(1). See, e.g., United States v. Van, 543 F.3d 963, 966 (8th Cir. 2008). Tate asserts such cases were either wrongly decided or are distinguishable because Tate "also pled guilty to a racketeering charge, which required proof that the three drug transactions were part of a pattern of illegal activity." Further, Tate maintains he is the victim of "improper sentencing manipulation," because "[i]t is similar to those federal cases where the police allow criminal behavior to continue unabated until the drug quantity reaches the level requiring a mandatory minimum sentence."

Governing precedent forecloses Tate's arguments. Van is strikingly similar to the case at bar. Lafayette Van argued the fifteen-year mandatory minimum sentence set forth in § 924(e)(1) did not apply because (1) his three prior Minnesota state court convictions for selling crack cocaine were part of "one criminal episode"; (2) he contemporaneously pled guilty to racketeering and his three drug transactions constituted a "pattern of illegal activity"; and (3) he was the victim of "improper sentencing manipulation." See Van, 543 F.3d at 965-67. Van's criminal history was nearly identical to Tate's: Van had a prior robbery conviction, three convictions for selling crack cocaine, and a racketeering conviction. See id. at 966. Van also was involved in the underlying state court action which resulted in Tate's 2005 drug dealing and racketeering convictions. See id. Indeed, Van helped Tate sell the crack cocaine involved in the August 22, 2002 drug transaction. See id.

-12-

Tate was convicted of selling crack cocaine on July 29, 2002, August 22, 2002, and August 23, 2002. Van was convicted of selling crack cocaine on August 15, 2002, and twice on August 22, 2002. See id. Van held Van's convictions arising out of his conduct on August 15, 2002 and August 22, 2002 were distinct because they occurred on different dates.[5] See id. In light of Van's prior robbery conviction, the fifteen-year mandatory minimum in § 924(e)(1) applied to Van. See id. at 965-66. Similarly, Tate's 2005 drug dealing convictions, which arose out of conduct on July 29, 2002, August 22, 2002, and August 23, 2002, count as three distinct predicate offenses under 18 U.S.C. § 924(e)(1).

Tate acknowledges Van's "underlying state court drug case was factually indistinguishable from Tate's." Tate wishes to reargue the merits of Van, contending Van misinterpreted United States v. Johnston, 220 F.3d 857, 861-62 (8th Cir. 2000). We are bound to reject Tate's nearly identical arguments. See Drake v. Scott, 812 F.2d 395, 400 (8th Cir. 1987) ("One panel of this Court is not at liberty to disregard a precedent handed down by another panel.").

## III. CONCLUSION
We affirm.

_____

---

[5]The panel did not decide whether Van's two convictions for selling crack cocaine on August 22, 2002 were distinct predicate offenses. See Van, 543 F.3d at 966. These underlying sales occurred one-half hour apart. See id.

-13-