# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1747

_____

United States of America,             *
                                     *

             Appellee,          *
                                       *   Appeal from the United States
       v.                        *   District Court for the
                                       *   Western District of Missouri.
Edulio Perez,                  *
                                     *

            Appellant.       *

_____

Submitted: September 23, 2011
Filed: December 13, 2011

_____

Before MELLOY, SMITH, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Edulio Perez of conspiring to manufacture 100 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846 ("Count 1"); possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) ("Count 2"); and being an illegal alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2) ("Count 3"). On appeal, Perez argues that the district court[1] erred in denying his motion for judgment of acquittal or, in the alternative, a new trial, on Counts 2 and 3 because no reasonable

---

[1] The Honorable Gary Fenner, United States District Judge for the Western District of Missouri.

jury could conclude beyond a reasonable doubt that he constructively possessed a firearm. Additionally, he argues that no reasonable jury could have found the interpreter who testified at his trial credible because of alleged inconsistencies in her translation of Perez's statement to law enforcement authorities following his arrest. We affirm.

## I. *Background*

In May 2009, officers with the Missouri State Highway Patrol (MSHP) began investigating a large, cultivated marijuana field hidden in a wooded area in rural Caldwell County, Missouri. Over the course of their investigation, the officers observed more than 100 marijuana plants, approximately 8 to 12 feet tall, growing in the field, as well as various tools used in the cultivation of marijuana.

During a visit to the field on July 21, 2009, MSHP Trooper Aaron Griffin observed an irrigation ditch that had been dug to channel water from a nearby bean field toward the marijuana plants. Trooper Griffin noticed that trees had been cut down to allow sunlight to reach the plants. Someone had also removed underbrush around the marijuana. The marijuana was planted in mounds, with several stalks coming out of each mound. Trooper Griffin was confident that there were more than 100 marijuana plants in the field. Trooper Griffin placed a hidden video camera near the marijuana field, which recorded a man resembling Perez checking the roots and stems of marijuana plants.

A couple months later, Trooper Griffin and MSHP Sergeant Larry Allen entered the woods again, following a foot path through the woods to determine where the marijuana growers entered the property. The officers discovered a tent used to dry marijuana. Trooper Griffin and Sergeant Allen saw a camouflage jacket and denim shirt stuck underneath the tent. The officers then immediately left the area because they thought that they heard someone approaching.

Trooper Griffin and Sergeant Allen returned to the area less than an hour later and split up to follow different paths. Sergeant Allen discovered Perez and Sirio Medina next to another tent similar to the one seen earlier. Sergeant Allen was approximately 25 to 30 yards away from them and saw Perez and Medina tightening ropes and hanging marijuana. After briefly observing the men, Sergeant Allen ran toward Perez and Medina and yelled, "Highway Patrol, don't move." Medina went down on his knees, but Perez ran. Trooper Griffin then chased after Perez for almost a quarter mile; Perez refused Trooper Griffin's orders to get on the ground. Trooper Griffin finally overtook and subdued Perez; he then escorted him back to Sergeant Allen's location.

Within a few feet of the tent where Perez and Medina had been working on the marijuana, officers recovered a .22 caliber rifle, a walkie-talkie, a saw, and clothing. The loaded rifle contained 14 rounds of ammunition, which Trooper Griffin removed for safety concerns.

Later that day, Sergeant Andrew Ignatenko of the Caldwell County Sheriff's Department helped search the abandoned house near the marijuana field and found more potential grow operation tools. Additionally, he found a box of .22 caliber ammunition on the windowsill of an upstairs room, next to a sleeping area. Although Sergeant Ignatenko did not know who slept in that room, the ammunition from the house exactly matched the ammunition recovered from the rifle found next to Perez and Medina.

At Perez's trial, Sergeant Ignatenko testified that out of the 50 to 60 drug investigations that he had participated in, there was always a firearm involved. He explained that he never sought DNA or fingerprint testing because the firearms are often located in close proximity to the subject.

Special Agent Paul Carrington of the Drug Enforcement Administration, who also participated in the investigation, testified as an expert that it is routine to find growers with weapons, such as rifles, near their operations. Based on his experience and training, Agent Carrington noted that firearms are present to protect the marijuana grow operation. He testified that during the harvest season, the marijuana is very valuable and that growers possess firearms to protect themselves or keep others from discovering the field and taking the marijuana.

Alfonso Cabrera-Verdugo, a lookout at the abandoned house near the marijuana, testified that he saw Perez take the .22 caliber rifle into the field. Cabrera-Verdugo stated that Perez asked Samuel Uribe, another individual involved in the marijuana grow operation, for the rifle for Perez's protection from thieves. According to Cabrera-Verdugo, Perez obtained the gun two days before they returned to the abandoned house in September 2009. Cabrera-Verdugo also testified that he saw a box of ammunition in the bedroom of the abandoned house where Perez and Medina slept and that he witnessed Perez load the gun.

Task Force Officer Peter Oulman interviewed Perez through Maria Morrison, a Spanish-language interpreter. During the interview, Perez acknowledged awareness of the firearm found in the field. He contended, however, that it was just there in case the opportunity arose to shoot a deer.

At trial, Perez initially denied being involved with the marijuana grow operation. He maintained that he fled to get help from the police. Eventually, however, Perez admitted being paid to work with the marijuana. Perez denied being close to the firearm, and he asserted that the officers were not telling the truth. Perez claimed that the gun belonged to Uribe. Perez maintained that he did not pick up the firearm because he had no need for it. He stated that he never touched the gun. According to Perez, the first time that he saw the rifle was approximately two days before his arrest. He denied loading the gun, asking Uribe for it, or telling Cabrera-

-4-

Verdugo that the gun was for protection. He testified that he never told law enforcement that the gun was there to shoot a deer.

At the close of the government's case, Perez moved for judgment of acquittal on all counts, and the district court denied the motion. The jury found Perez guilty on all counts. Thereafter, Perez renewed his motion for judgment of acquittal or, in the alternative, a new trial. The district court denied Perez's motion. The district court sentenced Perez to 63 months' imprisonment on Counts 1 and 3, concurrently, and 60 months' imprisonment on Count 2, consecutive to the other counts.

## II. *Discussion*

On appeal, Perez asserts that the district court erroneously denied his motion for judgment of acquittal or, in the alternative, new trial. He argues that the government failed to present sufficient evidence to prove beyond a reasonable doubt that he possessed both the power and the intention to exercise dominion or control over the .22 caliber rifle recovered. He also argues that no reasonable jury could have found the interpreter credible. Perez contends that alleged inconsistencies in the interpreter's translation of Perez's statement to authorities following his arrest show that her translation was unreliable.

This court "review[s] the district court's denial of a motion for judgment of acquittal de novo." *United States v. Tate*, 633 F.3d 624, 628 (8th Cir. 2011). But "the underlying standard of review is deferential to the jury's verdict," as this court will "reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id*. (quotation and citation omitted). "We must view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." *Id*. (quotation and citation omitted). We do not lightly overturn a jury's guilty verdict. *Id*. We note that, in reviewing a defendant's challenge to the sufficiency of the evidence, "[w]itness testimony . . . does not need to be corroborated." *United States v. Jefferson*, 652 F.3d 927, 930 (8th Cir. 2011).

"And a jury's credibility determinations are virtually unreviewable on appeal." *Id*. (quotation and citation omitted).

We review for abuse of discretion a district court's denial of a motion for new trial. *Tate*, 633 F.3d at 629. "Reversal of a denial of a motion for new trial is rare." *Id*.

## A. *Constructive Possession*

Perez asserts that the government did not establish his constructive possession of the .22 caliber rifle found at the scene of arrest because (1) Perez did not own or control the premises upon which the rifle was discovered; (2) Trooper Griffin admitted that neither the property nor the house located on the property where the marijuana plants were discovered were owned by Perez, Cabrera-Verdugo, or Uribe; (3) Perez was not the registered owner of the rifle itself, which was manufactured in Connecticut and obtained by Uribe; (4) Perez did not control the marijuana grow operation where the weapon was discovered; instead, he was merely cleaning up trash, fixing a fence, and redoing a roof ; (5) Perez testified that he never touched the rifle; (6) Perez was arrested more than 50 yards away from the rifle; (7) law enforcement made no attempt to determine ownership of the rifle through forensics or interrogation; (8) no one ever saw the rifle under Perez's control; and (9) no one testified that Perez controlled or intended to control the weapon.

In response, the government argues that it presented sufficient evidence to permit a reasonable juror to find Perez guilty beyond a reasonable doubt because (1) law enforcement officers actually witnessed Perez working with marijuana under a tent, which had a .22 caliber rifle located next to it; (2) Perez was arrested 50 yards from that location because he ran from the officers once they announced themselves; (3) a coconspirator testified that Perez was in charge of growing the marijuana and that Perez obtained the firearm for his protection in the field; (4) a special agent with the DEA testified, as an expert witness, that drug traffickers often possess firearms

for their protection; and (5) Perez admitted in a statement to authorities that he knew about the rifle, although he insisted that it was to shoot deer.

Perez was convicted of possessing a firearm in furtherance of a drug trafficking crime and being an alien in possession of a firearm. His claim is only that the government failed to present sufficient evidence to establish his constructive possession of the rifle.

To sustain a conviction under both 18 U.S.C. §§ 924(c) and 922(g)(5), the government must prove that Perez "possessed" a firearm. *See, e.g., United States v. Saddler*, 538 F.3d 879, 888–89 (8th Cir. 2008) (holding that sufficient evidence existed of defendant's actual and constructive possession of firearms to support his conviction for possession of a firearm during and in relation to a drug-trafficking crime); *United States v. Patterson*, 886 F.2d 217, 219 (8th Cir. 1989) (holding that sufficient evidence existed of defendant's constructive possession of firearm for purposes of motion for acquittal on charge of illegal possession of a firearm under § 922(g)(5)).

> "Possession can be actual or constructive. Actual possession is the knowing, direct, and physical control over a thing." *United States v. Serrano–Lopez*, 366 F.3d 628, 634 (8th Cir. 2004) (citation omitted). "Constructive possession is established by proof that the defendant had control over the place where the firearm was located, or control, ownership, or dominion of the firearm itself." *United States v. Cox*, 627 F.3d 1083, 1085 (8th Cir. 2010). "Possession may be joint; it need not be exclusive," [*United States v.*] *Smart*, 501 F.3d [862,] 865 [(8th Cir. 2007)], and "may be based on circumstantial evidence which is 'intrinsically as probative as direct evidence.'" *United States v. Bradley*, 473 F.3d 866, 867 (8th Cir. 2007) (quoting *United States v. Patterson*, 886 F.2d 217, 219 (8th Cir. 1989) (per curiam)).

*United States v. Brown*, 634 F.3d 435, 439 (8th Cir. 2011).

"The government, of course, must show a sufficient nexus between the defendant and the firearm." *United States v. Byas*, 581 F.3d 723, 726 (8th Cir. 2009) (quotation and citation omitted). Although "mere physical proximity is insufficient to establish constructive possession, the factfinder may infer defendant had control of the firearm based on all the circumstances." *Id*. (quotation and citation omitted).

Here, sufficient evidence exists in the record that Perez "possessed" the .22 caliber rifle. First, the facts show temporal and spatial proximity because Perez was observed near the weapon. He was arrested 50 yards from where the rifle was found because he ran from the officers. The rifle was recovered within "a matter of feet" from the hanging marijuana, where Perez was working.

Second, according to Officer Oulman's testimony, Perez admitted his knowledge of the rifle's presence to the police, telling them that "the gun was there in case the opportunity arose to shoot a deer." And, at trial, Perez testified that there was, in fact, "a gun in the field."

Third, Agent Carrington testified as an expert that marijuana growers are routinely found with weapons. These firearms are almost entirely for protection related to the marijuana grow. Video evidence admitted at trial confirmed Perez's presence and involvement in the marijuana grow operation. Furthermore, after his arrest, Perez told officers that he was cultivating marijuana and described the process. Perez told officers that "some of the marijuana plants had matured earlier than others, and he had cut them and began drying them." At trial, Perez admitted that, when he was arrested with Medina, he was "working with the plant materials . . . hanging [them] upside down." Perez also admitted that he was using a "saw that afternoon to cut branches so [he] could hang marijuana."

-8-

Fourth, Cabrera-Verdugo, a codefendant, testified that he actually saw Perez with a .22 caliber gun and witnessed Perez "load the gun." According to Cabrera-Verdugo, he saw Perez hold the gun, as Perez "would take it to the field." Cabrera-Verdugo stated that Perez (1) told him that "he wanted a firearm," (2) "requested [the gun] for protection," and (3) told him that the gun "was for protection." Cabrera-Verdugo explained that Perez asked for a gun "[b]ecause they were going to be cutting and cleaning." Cabrera-Verdugo also said that he "saw a box [of bullets] in the bedroom where Perez slept."

We conclude that the district court did not err in denying Perez's motion for judgment of acquittal or, in the alternative, new trial, based on the sufficiency of the evidence.

B. *Interpreter*

Perez also contends that the facts of the case cast substantial doubt on the accuracy of the interpreter's translation of his interview with law enforcement. Perez maintains this argument despite his cross-examination of the interpreter at trial. According to Perez, the interpreter's translation "was wrought with so many inconsistencies and errors that it should be deemed wholly unreliable." He asserts that the interpreter was "inaccurate on everything from the spelling and pronunciation of [Perez's] name, to his birth date, to the number of children he fathered, to the gender of those children." Perez asserts that the translation "calls into question [his] connection to the entire marijuana growing operation" and also "calls into question [his] ownership of the .22 caliber rifle necessary to maintain [Counts 2 and 3]." Perez argues that the district court should have granted his motion for judgment of acquittal on the constructive possession counts because the interpreter's "translation was so inaccurate that the [g]overnment failed to prove beyond a reasonable doubt, and no reasonable juror could possibly conclude, that [he] possessed a rifle to protect himself from rogue deer." Alternatively, he argues that the district court should have granted

him a new trial because the inaccurate translations may have resulted in a miscarriage of justice, if the jurors relied upon them.

According to her trial testimony, Morrison, the interpreter during the post-arrest interview, is fluent in both English and Spanish, and she considers both languages to be her native tongues. She has extensive translation experience, dating back to her childhood. She has been a professional translator for 30 years, and she has 23 years of law enforcement translation experience. Morrison testified that she works as a bilingual emergency dispatcher for the Excelsior Springs Police Department and owns her own business, Morrison Translating.

Prior to her interview with Perez, Morrison was not given any explanation about the investigation; she had no knowledge about the drugs involved or the weapon found. She took notes throughout the interview with Perez, but she did not intend them to be a verbatim transcript. Morrison noted that Perez "seemed to be pretty knowledgeable about the cultivating of marijuana." According to Morrison, although Perez initially denied knowledge of the rifle, he eventually stated that the gun was in the field for protection from deer. He did not mention touching or using the gun.

During cross-examination at trial, Perez's counsel questioned Morrison about the notes that she took during the interview with Perez. Counsel asserted discrepancies as to the spelling of Perez's name, his birth date, and the number of children that he had. In response, Morrison never conceded to the inaccuracy of her translation.

Our role is *not* "to determine whether [Morrison's] translated version of [Perez's] . . . statement should be disregarded"; instead, "it is the function of the finder-of-fact to weigh the evidence presented by the parties as to the accuracy of the proffered translation and to determine the reliability of the translation on the basis of

-10-

that evidence." *United States v. Fujii*, 301 F.3d 535, 540 (7th Cir. 2002) (quotation and citation omitted). Perez "challenged [Morrison's] linguistic abilities on cross-examination and attempted to demonstrate to the jury why it should have found [Morrison's] translations untrustworthy, and the jury was not convinced." *Id*. This court will not "second-guess this credibility determination on appeal." *Id*.

Therefore, the district court did not err in denying the motion for judgment of acquittal or, in the alternative, new trial, based on any purported inconsistencies in Morrison's translation of Perez's statement to law enforcement.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____