# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-3268

_____

United States of America

*Plaintiff - Appellee*

v.

Dante Joseph Tyus, also known as Dante Daggs

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 24, 2025
Filed: February 18, 2026

_____

Before GRUENDER, STRAS, and KOBES, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A jury found Dante Joseph Tyus guilty of being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). At sentencing, over Tyus's objection, the district court[1] determined that a two-level enhancement for obstruction of justice

---

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

applied, *see* U.S.S.G. § 3C1.1, and sentenced Tyus to 84 months' imprisonment. On appeal, Tyus argues that the district court (1) erred in denying his motion for judgment of acquittal because insufficient evidence existed to support the jury's verdict, and (2) clearly erred when it applied the obstruction-of-justice sentencing enhancement. We affirm.

## I. Background

Late in the evening of Friday, September 27, 2019, a Minnesota state trooper observed a Chrysler Pacifica SUV being driven erratically. The trooper attempted to pull it over by activating his patrol vehicle's flashing lights and siren. The Pacifica did not pull over. Another state trooper pulled alongside the Pacifica and unsuccessfully attempted to force it to the side of the road. Eventually, the first state trooper executed a "PIT maneuver," or a "pursuit intervention technique," to contact the rear of the Pacifica with his patrol vehicle and force it to stop.

After the Pacifica stopped, the troopers identified Tyus as the driver and sole occupant of the vehicle. He appeared severely impaired and smelled strongly of alcohol. The troopers placed him under arrest for fleeing police and for driving while intoxicated. The Pacifica was towed to the parking lot of the Minnesota State Patrol's West Metro District Office, where it was locked and its keys deposited in a drop box. Although not secured by a fence, the District Office parking lot typically is frequented by state troopers at all hours. On the morning of Monday, September 30, 2019, a state employee processed the Pacifica for forfeiture, which included conducting an inventory search and locating its registered owner, D.B., Tyus's girlfriend and the mother of his child. The inventory search did not reveal any firearms. After completing the inventory search, the state employee locked the Pacifica and deposited its keys into a drop box. The Pacifica was then towed to a fenced and secured impound lot to await completion of the forfeiture process.

In custody, Tyus expressed concern about the Pacifica and its contents. While being driven to jail, he asked where his car was going. Upon being informed that it

was being towed, he asked if he could make a phone call "right now" and repeated the request for a phone several times. In jail, Tyus made 28 phone calls between September 28 and October 4, 21 of which were to D.B. In these recorded calls he routinely urged D.B. to retrieve the Pacifica, or at least items within it, as soon as possible. Tyus also expressed concern to D.B. about the retrieval process. For example, in one phone call, Tyus advised D.B. to have another person go with her to get the car: "somebody who can keep—you know what I'm talking about?"[2] D.B. responded that she would and reassured Tyus that "I'm pretty sure she okay." Tyus replied, "You think so?" D.B. answered, "If she would have had like a broken ankle or something, they would have had to tell you about it." In a subsequent phone call, Tyus asked when D.B. was going to "go get [her] car seats and shit." D.B. responded that she was going to try to go the next day to retrieve her "strollers" and "important papers." Tyus reiterated that D.B. should make sure to bring somebody along to "talk to them people" because "otherwise you ain't gonna be able to get your car seat out of there, you know what I'm saying." D.B. agreed she would not be able to get her "stroller" out of the car. The state employee who conducted the Pacifica's inventory search found neither a car seat nor a stroller in the vehicle.

In the meantime, Minneapolis Police Department Officers received information from a confidential informant that Tyus had a firearm inside the Pacifica when he was arrested and that he was trying to get his girlfriend to retrieve the firearm for him. Officers obtained a warrant to search the Pacifica for the gun, which they executed on Wednesday, October 2. After unsuccessfully searching the vehicle for thirty minutes, the officers discovered a loaded SCCY CPX-2 9mm semi-automatic firearm hidden behind the interior plastic paneling of the Pacifica. After seizing the firearm, the officers left paperwork documenting the seizure inside the Pacifica, hoping that the paperwork would prompt incriminating conversations on the jail calls between D.B. and Tyus.

_____

[2]Tyus disputes that the audio recording includes the word "keep." We have reviewed the audio recording and find it ambiguous. Viewing the evidence in the light most favorable to the jury's verdict, *see United States v. Chatmon*, 742 F.3d 350, 352 (8th Cir. 2014), we use the word "keep" here.

The next day, Tyus called D.B. while she and an unnamed companion were approaching the impound lot. Less than an hour later, Tyus called D.B. again. An unidentified man answered D.B.'s phone. Tyus asked: "what's going on?" The unidentified man answered, "Man, I don't know. The dude said they was in it the other day and got it." Tyus said "that shit is crazy," "I don't know how that shit gonna play out," and "fuck, fuck, fuck, fuck." The unidentified man said he planned to "play dumb as hell though" and Tyus said, "I hear you." The following day, Tyus again spoke with the unidentified man. Tyus told him that officers were coming in an hour to take a DNA swab. The unidentified man said, "That shit must have been in the whip" and Tyus responded, "yeah." Tyus said he needed advice from his lawyer.

An officer swabbed the firearm for DNA evidence, which ended up being analyzed twice by the Minneapolis Police Department's crime lab. The first analysis took place in January 2020. A forensic scientist at the lab interpreted the DNA recovered from the firearm as a "mixture of five or more individuals," which—under the then-current standards—meant that it was not suitable for comparison because of the "complexity of the mixture." More than three years later, the lab reanalyzed the firearm using a new method of DNA analysis called STRmix, "a comprehensive software program" that performs "probabilistic genotyping" by using "biological modelling, mathematical equations, and theories." A forensic scientist from the lab testified at Tyus's trial that STRmix has become a generally accepted procedure in the scientific community. This second analysis indicated that the firearm contained a mixture of DNA from four individuals and that the mixture was "greater than 100 billion times more likely to be explained by Dante Joseph Tyus and three other unknown, unrelated individuals, than it being explained by four unknown, unrelated individuals" not including Tyus.

In August 2023, the Government charged Tyus with being a felon in possession of a firearm. A jury trial took place in April 2024, during which the Government presented extensive evidence, including the recorded jail calls and expert testimony regarding the DNA evidence. Tyus presented his own expert

-4-

witness who critiqued the second DNA analysis, citing concerns with the lab's quality assurance standards and history of contamination events, as well as technical issues with the analysis itself. After the close of evidence, Tyus moved for a judgment of acquittal, arguing that insufficient evidence existed to support a guilty verdict. The district court denied his motion, and the jury found Tyus guilty. At sentencing, the district court applied a two-level obstruction-of-justice sentencing guideline enhancement based on "multiple jail calls" showing that Tyus had contacted his girlfriend several times and pressured her to remove the firearm from the vehicle. Tyus objected to the application of this enhancement. The district court overruled his objection and imposed a within-guidelines sentence of 84 months' imprisonment. Tyus appeals.

## II. Discussion

Tyus argues the district court: (1) erred in denying his motion for judgment of acquittal because insufficient evidence existed to support the jury's verdict, and (2) clearly erred when it applied the obstruction-of-justice sentencing enhancement.

### A.

The Government presented sufficient evidence to support the jury's verdict. "We review the denial of a motion for a judgment of acquittal based on the sufficiency of the evidence *de novo*." *Chatmon*, 742 F.3d at 352. "We will affirm unless, viewing the evidence in the light most favorable to the Government and accepting all reasonable inferences that may be drawn in favor of the verdict, no reasonable jury could have found the defendant guilty." *Id.* (citation modified). To convict Tyus of being a felon in possession of a firearm under § 922(g), the Government had to prove four elements: (1) "previous conviction of a crime punishable by a term of imprisonment exceeding one year," (2) "knowing possession of a firearm," (3) "the firearm was in or affecting interstate commerce," and (4) that Tyus "knew he belonged to the relevant category of persons barred from possessing a firearm." *See United States v. Parsons*, 946 F.3d 1011, 1014 (8th Cir. 2020).

Tyus only challenges the sufficiency of the Government's evidence with regard to the second element—that he knowingly possessed a firearm. "Possession can be actual or constructive." *United States v. Perez*, 663 F.3d 387, 392 (8th Cir. 2011). "Constructive possession"—at issue here—"is established by proof that the defendant had control over the place where the firearm was located, or control, ownership, or dominion of the firearm itself." *See id.* Possession "may be based on circumstantial evidence which is intrinsically as probative as direct evidence." *Id.* (citation modified). To show constructive possession, the Government "must show a sufficient nexus between the defendant and the firearm." *Id.* "While mere physical proximity to a firearm is insufficient to prove constructive possession, knowledge of a firearm's presence, combined with control, is constructive possession." *United States v. Young*, 129 F.4th 459, 471 (8th Cir. 2025) (citation modified).

Here, Tyus concedes that the Government presented sufficient evidence to establish that he had control over the firearm. After all, the officers discovered the firearm stashed in a hidden compartment of a vehicle last driven and solely occupied by Tyus. Thus, if the Government presented sufficient evidence to prove that Tyus knew about the firearm's presence, we must uphold his conviction. *See id.*

The Government presented sufficient evidence. It introduced testimony that Tyus fled police until he was physically forced to pull over. *See United States v. Webster*, 442 F.3d 1065, 1067 (8th Cir. 2006) (finding that evidence of flight from police could be probative "to show consciousness of guilt of the crime charged" (citation modified)). The Government presented numerous recordings of jail calls in which Tyus urged D.B. to recover both the Pacifica itself as well as various items from within the Pacifica, including "car seats" and "strollers" that were never discovered in the vehicle. A Minneapolis Police Department officer testified that he interpreted these as "code words" that Tyus used to reference the hidden firearm. The jury also heard testimony that it was "greater than 100 billion times more likely" that the DNA resulted from Tyus and "three other unknown, unrelated individuals" than from "four unknown, unrelated individuals" not including him. Taken together,

this constitutes sufficient evidence to support the jury's verdict. *See Young*, 129 F.4th at 471.

Tyus argues otherwise, characterizing the Government's case as relying on a circumstantial "mere-proximity thesis," speculation regarding the meaning of the recorded jail calls, and flawed DNA evidence. We disagree. First, "as a jury rarely has direct evidence of a defendant's knowledge of a firearm's presence, knowledge is generally established through circumstantial evidence." *See United States v. Battle*, 774 F.3d 504, 511 (8th Cir. 2014) (citation modified). Second, the Government did not rely on a "mere proximity thesis"; it presented evidence tending to show that Tyus had both control over and knowledge of the firearm. *See Young*, 129 F.4th at 472 (relying on extensive evidence of actual and constructive possession to reject defendant's argument that he was "in mere proximity of the firearm"). Third, viewed in the light most favorable to the jury's verdict, *id.* at 471, the jail calls support the reasonable inference that Tyus knew about the firearm. *See United States v. Boesen*, 491 F.3d 852, 858 (8th Cir. 2007) ("The government is given the benefit of reasonable inferences, so long as they are not conjecture and speculation."). In the jail calls, Tyus was unusually concerned about the recovery of the Pacifica and of at least one item from within the vehicle. Further, upon receiving news that D.B. and her companion had discovered paperwork in the Pacifica informing them the firearm had been discovered and removed, Tyus's reaction was consistent with that of a person who knew the firearm had been hidden in the vehicle. Finally, "[t]he DNA evidence, even if not conclusive, supported other evidence of possession." *United States v. Cross*, 888 F.3d 985, 991 (8th Cir. 2018). And while competing evidence was presented, "[t]he jury has the sole responsibility for resolving conflicts or contradictions in the testimony . . . ." *See United States v. Morin*, 338 F.3d 838, 844 (8th Cir. 2003). Altogether, the district court did not err in denying Tyus's motion for judgment of acquittal based on sufficiency of the evidence.

**B.**

The district court did not clearly err in finding that a two-level sentencing enhancement applied because Tyus had attempted to obstruct evidence. "We review a district court's interpretation and application of the Guidelines *de novo* and its factual findings for clear error." *United States v. Beattie*, 919 F.3d 1110, 1116 (8th Cir. 2019). "We give great deference to a district court's decision to impose an obstruction of justice enhancement, reversing only when the district court's findings are insufficient." *Id.* The sentencing guidelines provide for a two-level offense enhancement if (1) the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction"; and (2) "the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1.

The district court found that the obstruction enhancement applied because multiple jail calls indicated "Tyus's clear concern about the consequence of finding the firearm in the vehicle." It also found that, based on the jail calls, "there's no doubt that trying to get the weapon out of the vehicle was [Tyus's] primary motivation." The district court concluded that Tyus had therefore attempted to procure another person to conceal evidence that was material to an official investigation and that, consequently, the obstruction enhancement applied. Tyus argues this was impermissible speculation as to the meaning of the jail calls. We disagree. The record amply supports the reasonable inference that Tyus was attempting to convince D.B. to remove the firearm from the Pacifica when they discussed how to retrieve apparently non-existent "strollers" and "car seats" from the vehicle. *See* U.S.S.G. § 3C1.1 cmt. n.4 (providing examples of covered conduct, including "directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding"). Therefore, the district court did not clearly err in applying the enhancement.

-8-

## III. Conclusion

For the foregoing reasons, we affirm.

_____