# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-3345

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Carolyn M. Louper-Morris, | * | |
| | * | |
| Appellant. | * | |

_____

No. 11-1021

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| William J. Morris, Jr., | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 21, 2011
Filed: March 2, 2012

_____

Before RILEY, Chief Judge, SHEPHERD, Circuit Judge, and WEBBER,[1] District Judge.

———————

WEBBER, District Judge.

A jury convicted Carolyn M. Louper-Morris of conspiring to commit mail fraud and wire fraud in violation of 18 U.S.C. § 371, aiding and abetting wire fraud in violation of 18 U.S.C. § 1343, and aiding and abetting mail fraud in violation of 18 U.S.C. § 1341. A jury convicted William J. Morris, Jr., of conspiring to commit mail fraud and wire fraud in violation of 18 U.S.C. § 371, aiding and abetting wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, and making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1). Louper-Morris and Morris both appeal.

Louper-Morris raises six issues on appeal: 1) the district court[2] erred by denying her motion to dismiss the indictment because the United States made a material misrepresentation to the grand jury; 2) the district court erred in overruling her objection under *Batson v. Kentucky*, 476 U.S. 79 (1986); 3) the evidence was insufficient to support her convictions; 4) the United States intimidated one of her witnesses thereby depriving her of the right to present a complete defense; 5) the district court erred by enhancing her base level offense by four points for her role as a leader or organizer of an activity involving five or more participants under United States Sentencing Guidelines § 3B1.1; and 6) cumulative trial errors warrant reversal or at least remand.

———————

[1]     The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]     The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

Morris raises six issues on appeal: 1) the evidence was insufficient to support his convictions; 2) the wire and mail fraud statutes, as applied to Morris, exceed Congress's authority to legislate in violation of the Tenth Amendment; 3) the district court erred by not allowing the jury to view the live website at issue; 4) the district court erred in overruling his objection under *Batson*, 476 U.S. at 79; 5) the district court erred in enhancing his base offense level by four points for his role as a leader or organizer of an activity involving five or more participants under U.S.S.G § 3B1.1 and by two points for the sophisticated-means enhancement under U.S.S.G. § 2B1.1(b)(9)(C); and 6) the district court's restitution order improperly included restitution to an entity that was already receiving compensation from a settlement agreement.

Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

We state the facts in the light most favorable to the jury's verdict. *United States v. Johnson*, 450 F.3d 366, 369 (8th Cir. 2006). Around 1996 in Washington, D.C., Carolyn M. Louper-Morris, a former college professor, assisted in the development of a software product entitled CyberStudy 101. CyberStudy 101 software allowed college students to enter their class notes into the program and the program would generate quizzes from this data. As a software product, CyberStudy 101 never reaped a profit and the venture failed.

Louper-Morris then moved to Minneapolis, Minnesota to live with her son, William J. Morris, who is an attorney. Louper-Morris and Morris (collectively, "Appellants") decided to try to sell CyberStudy 101 over the internet using the website cyberstudy101.com. Appellants formed the company, Cyberstudy 101, a Minnesota corporation (hereinafter "CyberStudy"). Louper-Morris owned a 51 percent interest in the company and Morris owned a 49 percent interest.

Around 1998, Appellants learned of a Minnesota tax credit called the Education Tax Credit. Enacted in 1997, the tax credit was available to low-income Minnesota families who incurred out-of-pocket expenses for certain supplemental educational opportunities for their children in elementary school, middle school, or high school. In order to utilize the tax credit, Appellants changed the educational content of CyberStudy 101 from a college curriculum to an elementary and secondary school curriculum. Louper-Morris also met with employees of the Minnesota Department of Education, the Minnesota Department of Revenue, and other agencies to research the tax credit's requirements in order to utilize the tax credit to expand CyberStudy's business opportunities.

One such individual with whom Louper-Morris met to discuss the tax credit was Morgan Brown, the Director of the Partnership for Choice in Education ("PCE"). PCE is a nonprofit organization that seeks to educate low-income families about the educational opportunities available to them and advocates for additional educational options. At the time, PCE focused on implementing the tax credit and improving its accessibility. PCE had an informal relationship with the Minnesota Department of Education and the Minnesota Department of Revenue. Because of the organization's goals, many individuals and groups contacted Brown to educate them on how to utilize the tax credit.

At a December 1999 meeting, Brown described to Louper-Morris the two available educational tax credits and their requirements. The first credit applied to educational computer software or hardware, which allowed a family to claim up to $200 in a tax credit for purchasing a qualified computer product. The other credit applied to instruction or tutoring provided by a qualified instructor, which allowed a family to claim up to $1000 for one child or $2000 for the family. Brown stressed that the tutoring tax credit required an actual qualified instructor interacting with students. He explained that static content would not satisfy the tax credit's requirements and any tutoring product must be interactive. Louper-Morris told

Brown that she was interested in revising CyberStudy 101 to make it comply with the tax credit requirements.

Brown also explained to Appellants that the tax credit could not be claimed until the person had actually made the qualifying expenditure. Because many low-income families have limited disposable income, Appellants discussed with Brown financing options for potential CyberStudy customers. Although the tax credit allowed financing, the tax credit prohibited the vendor of the service from also being a lender. Only a separate third party could loan money to the taxpayer to pay for the qualifying educational service or product.

Brown also had interactions with Morris in early 2000. According to Brown, Morris functioned as CyberStudy's legal counsel and was also involved in business planning and development. Brown repeatedly discussed with Morris the requirements of educational tax credits and how those requirements relate to CyberStudy's product. Brown met with Appellants on numerous occasions, and each time he reiterated the requirements of the tax credit.

At some point, Brown learned that Appellants were marketing CyberStudy 101 by offering a free computer if a person signed up for the online tutorial program. Appellants told Brown that they had negotiated with K-Mart for a certain number of computers to offer with their program.

In May 2000, Brown was present at a meeting with the Minnesota Department of Revenue and the Minnesota Department of Education in which Appellants presented CyberStudy 101 in an effort to qualify the product for the tax credits. At that meeting, it was clearly communicated to Appellants that tutors and interactivity were necessary to qualify for the credit.

Appellants began selling CyberStudy 101 on floppy disk for $999 for families with one qualifying child, and $1499 for families with two or more qualifying children. CyberStudy 101's content was then placed online. Appellants informed Brown that they were in the process of hiring retired teachers to satisfy the tax credit's interactivity requirement and the qualified instructor requirement.

Appellants marketed CyberStudy through their "break the digital divide" campaign that promised a free computer and free internet access for life to everyone who registered for the product. They distributed fliers to local churches, schools, and community centers in African American, Somali, and Hmong communities. Appellants also mailed fliers to individuals residing in low-income communities. The fliers highlighted the free computer and did not mention the cost of the online tutorial program. Fliers stated such things as, "Stop, break the digital divide and sign-up for CyberStudy 101. Receive a new, fully-loaded complimentary free computer. No out-of-pocket expense." Because of this campaign, evidence shows that members of the community thought CyberStudy was a charitable organization when, in fact, it was a for-profit company. CyberStudy marketed the tutorial as an age-appropriate, online, interactive tutorial course that included twenty-eight study tools in four languages.

In February 2000, the Minnesota Attorney General's office received complaints and inquiries relating to CyberStudy soliciting personal information from individuals living in low-income communities and CyberStudy's promise of giving away 100,000 free computers to low-income individuals. Deb Strafaccia, a consumer fraud investigator for the Minnesota Attorney General, investigated the complaints. Strafaccia became concerned when she learned that hundreds of individuals were providing the relatively unknown CyberStudy with birth certificates, tax returns, social security numbers, and children's school records. Strafaccia spoke with Louper-Morris who informed her that CyberStudy needed to enroll 100,000 applicants in order to receive funding from investors. Louper-Morris indicated that the computers

and internet access would be free, but the customer would have to pay for the online tutorial.

Strafaccia was disturbed by the information from her initial investigation, therefore, she posed as a customer and conducted an undercover investigation at a CyberStudy enrollment event held at a St. Paul, Minnesota church. At the event, Strafaccia spoke with individuals eager to get the free computer. She observed that many of the individuals were from the Somali and Hmong communities and had limited English-speaking skills. The individuals were convinced that the computer was free and felt an urgent need to encourage others to enroll for the program in order to hit the 100,000 customer requirement. Morris was at the event and he stated that there would be no out-of-pocket expenses for the customers. He mentioned the online tutorial. Strafaccia waited in line for two hours to enroll in the program. She provided the necessary documents and signed the paperwork; however, she was not allowed to take copies of the agreement with her. She left the event convinced that consumers were being misled to believe that the computer and internet access was completely free and that the consumer would not be required to make any personal expenditure for the products.

After Straffacia's investigation, assistant Attorney General Karen Olson conducted an investigative meeting with Appellants. At the meeting, Appellants told Olson that private investors were funding the program in order to give low-income individuals free computers and free internet access "for life." They told her that the purpose of these free products was to facilitate access to the CyberStudy online tutorial program. Appellants indicated that they needed 100,000 participants to go forward and that cost would be approximately $1000 for each participant. Olson told Appellants that if the participants were indeed signing loan documents, then in fact, the computer and internet access were not free.

Louper-Morris also recruited volunteers to staff CyberStudy by describing the company's product and Appellants' efforts to "break the digital divide" to pastors of African American churches in the area. One pastor, Reverend Jerry McAfee of the New Salem Baptist Church, became particularly involved with CyberStudy: he let Appellants operate CyberStudy from a building owned by the New Salem congregation and he recruited congregation members to volunteer to enroll people in the CyberStudy program. Rev. McAfee testified that he loaned Appellants $2500.

Contrary to the assertions on CyberStudy's marketing materials, Appellants had not secured promises from private investors to fund the program if they enrolled 100,000 customers. Appellants needed to secure financing for customers in order to satisfy the tax credit's pay-up-front requirement and to pay employees. Appellants approached various banks, Catholic Charities, community organizations, and credit card companies to secure a revolving line of credit or pool loan. Their endeavors were not successful. At some point, Appellants eventually formed the idea of using Rev. McAfee as a front for a lender of a "revolving pool loan" through the organization Salem, Inc.[3]

Jacqueline Denita Hollie, a New Salem congregation member, was introduced to Louper-Morris after hearing about CyberStudy from her father and her twin sister, Jacqueline Benita Williams. She testified, "I heard about [CyberStudy] as the free computer people." Louper-Morris represented to Denita that she was the CEO and

---

[3]  The term "pool loan" is not defined by either party. We gather that the parties are referring to a loan that aggregates funds and allows individuals to borrow from that pool of money. The borrowers then pay that money back into the pool and other individuals may then borrow money. Regarding the pool loan, Morris testified that "the pool didn't have money for a one-to-one exchange. If we had that kind of money and we had five million dollars . . ., we would never have needed a pool loan to begin with. What we had was a pot of money that people could – that you could access, that everybody could access if they had, you know, signed off on the appropriate documentation."

president of CyberStudy and told her that the company could earn about three million dollars from the tax credit. Denita began working part time in the evenings at CyberStudy and then full time, organizing paperwork and assisting customers in signing up for the program. Denita also created usernames and passwords for customers. She expected to be paid for her work. She testified that customers did not receive access to the tutorial and that the promise of a free computer lured people to sign up for the CyberStudy 101 tutorial. Denita worked for CyberStudy from April 2000 until Appellants terminated her employment on July 13, 2001. At trial, Denita testified that all the acts she committed at CyberStudy were "at the direction of the owners of the company." There was no evidence to suggest that the owners of CyberStudy were anyone other than Appellants.

According to K-Mart executive, Lyman Locket, Appellants entered into a contract with K-Mart on December 19, 2000 whereby K-Mart would provide computers to CyberStudy. Locket had become interested in CyberStudy's "break the digital divide" campaign because he believed that the program would advance K-Mart's diversity initiative. The contract stated that CyberStudy agreed to purchase 4000 computers at $529.98 per unit, a value of 2.12 million dollars. Final payment was due on February 28, 2001. Appellants received 2284 computers from K-Mart. The contract contained no provision that would require K-Mart to provide free internet access. However, at that time, K-Mart was offering limited free internet access through BlueLight.com, an internal organization of K-Mart, to any K-Mart customer. The computers that were provided to CyberStudy all contained a compact disc from BlueLight.com, which would enable the owner to access the internet upon installation of the software.

Shortly after the K-Mart computers were distributed, Appellants began to file tax returns on behalf of customers. Denita Hollie, along with Appellants, filled out the tax return forms. CyberStudy's bank information was written on the forms as the account to which any refund should be routed. CyberStudy filed hundreds of tax

returns beginning December 31, 2000. The Department of Revenue returned many of those forms to CyberStudy because the requisite power-of-attorney form had not been completed. Louper-Morris instructed CyberStudy employees, including Denita Hollie, Benita Williams, and Jennifer Davis, to forge customers signatures if necessary. Louper-Morris told employees that the customer's initial signature on the customer contract provided them with sufficient authority to sign the customer's name on the power-of-attorney form.

In January 2001, after the Department of Revenue received many tax returns claiming the educational tax credit from moneys paid to CyberStudy, it held a meeting with Appellants to discuss details about its financing, specifically, who was acting as the company's third-party lender. The Department of Revenue wanted to see evidence that the third-party loans had been provided to the taxpayer and that the taxpayer then used that money to purchase CyberStudy's services. At the meeting, Appellants told the Department of Revenue that Rev. McAfee's company, Salem, Inc., was providing a pool loan for CyberStudy customers. Appellants stated that they had received payment for the tutorial program from Salem, Inc., for each customer that subscribed to the program. The Salem, Inc., lending arrangement was only a paper transaction and amounted to a sham loan agreement.

In February 2001, Department of Revenue officials went to CyberStudy's office at the New Salem Baptist Church for the purpose of confirming details about the pool loan. Denita, Morris, and Louper-Morris discussed the pool loan, but they spoke in generalities. They stated that Salem, Inc., had paid CyberStudy for each customer who signed up for the tutorial. At the meeting, Louper-Morris gave a demonstration of the CyberStudy website, but she did not allow the Department of Revenue representative to navigate the website.

At the request of the Department of Revenue, CyberStudy sent a letter to the Department describing the lending arrangement. The letter was signed by Rev.

McAfee. He testified that he did not draft the letter and he did not read the letter. Denita Hollie also testified that the letter was drafted by Louper-Morris and reviewed by Morris. The letter stated Salem, Inc., had loaned 4800 CyberStudy customers either $999 or $1499.

Shortly thereafter, the Department of Revenue began releasing tax credit money to Appellants. In February 2001, Appellants received $260,761 from the Department of Revenue in tax-credit reimbursements. The money was routed to CyberStudy's custodial account operated by Wells Fargo Bank. Louper-Morris purchased a new Mercedes Benz SUV with the money. She also purchased a fur coat. Morris purchased a $650,000 home and used money derived from the tax credit funds for a down payment.

CyberStudy did not receive tax credit money from each of its customers because CyberStudy made filing errors, or a customer independently filed his or her own tax return. In those cases, Appellants would threaten the customer with collection efforts and warn the customer that such efforts would ruin his or her credit score. Because many of the customers were from the Somali or Hmong communities, Appellants threatened that they would report customers to federal deportation authorities if the did not pay CyberStudy. Many customers took these threats seriously and brought money to CyberStudy's office. Appellants also used these intimidating tactics to seek collection from customers who did not receive the full tax credit.

Many individuals worked for CyberStudy. Denita Hollie, Benita Williams, Jennifer Davis, and Cheryl Cardinal were hired as employees, but none of them received any pay for their work. Outside tax preparers started assisting CyberStudy, including Al Pennicks. CyberStudy also hired an information technology specialist, Fong Xiong. His job was to train customers on using the computer and tutorial if they purchased a support package.

-11-

In April 2002, the Department of Revenue audited CyberStudy to assess whether it qualified for the educational tax credit. It determined that CyberStudy products did not meet the tax credit's requirements. Between February 2001 and May 2002, CyberStudy filed tax returns on behalf of over 1800 taxpayers, and received approximately $2.35 million in tax credit payments from the Department of Revenue.

K-Mart never received payment for the computers and filed a breach of contract suit against CyberStudy. After a few years of litigation, CyberStudy entered into a settlement agreement in which it was to pay K-Mart $610,000. CyberStudy failed to make any payments, and in October 2003, a judgment for $1,211,134.03, plus interest and attorney's fees was entered against CyberStudy.

On February 27, 2008, a grand jury returned an indictment charging each Appellant with one count of conspiracy to commit wire fraud and mail fraud in violation of 18 U.S.C. § 371, nine counts of wire fraud in violation of 18 U.S.C. § 1343, seven counts of mail fraud in violation of 18 U.S.C. § 1341, and five counts of promotion of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Morris was also charged with one count of making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1). On January 7, 2010, the indictment was amended to strike four of the wire fraud counts and all of the money laundering counts as to both Appellants.

Before trial, Appellants moved to dismiss the indictment. The magistrate judge[4] denied the motion on the ground that the motion was untimely filed and also failed on the merits. The district court adopted the magistrate judge's report and recommendation.

---

[4] The Honorable Janie S. Mayeron, United States Magistrate Judge for the District of Minnesota.

A three-week trial was conducted. Numerous witnesses testified on behalf of the United States including Morgan Brown; Deb Strafaccia; Karen Olson; Minnesota Department of Revenue employees; an investigator from the Internal Revenue Service; former K-Mart executive, Lyman Locket; and a United States Postal Inspector. CyberStudy employees and volunteers testified including Denita Hollie; her sister, Benita Williams; Carlos Granados, an accountant; Cheryl Cardinal; and Rev. McAfee.

CyberStudy customers also testified including Juanita Jensen; Mohamud Aideed, a Somali immigrant; Jurline Bryant; Kiin Farah, a Somali immigrant; Patricia Marquez-Preston; Faith Pfeiffer; Tana Danz; Tina Brown; Cheryl Cardinal, also a CyberStudy employee; Adrina Hobbs; Shirley Knudson; Tandalaya Jones-Paige; Sonja Overbaugh; Farhiya Ali; Brenda Amponsah; Saeed Ali, a Yemeni immigrant; Aimee Torres; Blong Pha, a member of the Hmong community; and Thi Huong Keosongseng.[5] Their testimony can be summarized as follows: the customers testified to signing contracts that they did not understand. They understood that they were to receive a free computer and free internet access. They did not take out a loan to finance the computer or sign any loan papers. Some customers did not know about the educational tutorial. Once home with the computer, most customers did not have internet access. If they had internet access, they could not access the tutorial. If they could access the tutorial, the tutorial lacked educational content and the web page would state that it was "under construction." Some customers understood that CyberStudy was going to complete their tax returns; however, those individuals expected to receive any refund if the refund amount surpassed the tax credit amount. In some cases, CyberStudy filed multiple tax returns on behalf of one customer claiming the tax credit on each tax return. Some customers testified that Appellants

---

[5] Blong Pha and Thi Huong Keosongseng both testified with the assistance of interpreters.

threatened them with collection actions. Some customers filed complaints with the Attorney General's office or the Better Business Bureau.

Louper-Morris did not testify, but Morris did testify. He testified that he drafted customer agreements and letters to customers threatening collection actions and letters threatening federal immigration investigations. He testified that he helped recruit customers at community centers and various churches. He also admitted committing tax fraud.

The jury returned a verdict of guilty on all counts in the amended indictment except Count 7, a mail fraud count, as to both Appellants, and Count 9, another mail fraud count, as to Morris.

Appellants moved for a new trial. In their motion, they alleged that Michelle Garcia-Strait, a potential defense witness, was intimidated by the United States. The district court held an evidentiary hearing on the matter. After the hearing, the district court issued an order denying the motion for a new trial. The district court expressly found that the United States did not threaten Garcia-Strait, and that Appellants chose not to call her as a witness. The district court noted that Garcia-Strait was concerned about testifying because she could be cross-examined about pending state court fraud and forgery charges. The district court concluded that the United States did not impermissibly interfere with Garcia-Strait and a new trial was not warranted.

At sentencing, the United States sought many enhancements to Louper-Morris's base offense level including a four-level increase for her leadership role in a criminal activity that involved five or more participants pursuant to U.S.S.G. § 3B1.1(a). Ultimately, her total offense level was 35 and her criminal history category was I. Her U.S.S.G. sentencing range was 168 to 210 months imprisonment. The district court sentenced Louper-Morris to 144-months imprisonment.

The United States also sought many enhancements to Morris's base offense level including the leadership enhancement pursuant to U.S.S.G. § 3B1.1(a) and the sophisticated-means enhancement pursuant to U.S.S.G. § 2B1.1(b)(9)(C). Morris's adjusted offense level was 35. His U.S.S.G. sentencing range was 168 to 210 months imprisonment. The district court sentenced Morris to 132-months imprisonment. The court ordered Louper-Morris and Morris, jointly and severally, to make restitution in the amount of $2,351,368.71 to the Minnesota Department of Revenue and $1,211,134.03 to Sears/K-Mart Corp. Neither Appellant objected to the restitution order.

Louper-Morris and Morris now appeal. Louper-Morris raises six issues on appeal: 1) the evidence was insufficient to support her convictions; 2) the district court erred in overruling her objection under *Batson*, 476 U.S. at 79; 3) the district court erred by denying her motion to dismiss the indictment because the United States made a material misrepresentation to the grand jury; 4) the United States intimidated one of her witnesses thereby depriving her of the right to present a complete defense; 5) the district court erred by enhancing her base level offense by four points for her role as a leader or organizer of an activity involving five or more participants under United States Sentencing Guidelines § 3B1.1; and 6) cumulative trial errors warrant reversal or at least remand.

Morris raises six issues on appeal: 1) the evidence was insufficient to support his conspiracy and wire fraud convictions; 2) the district court erred in overruling his objection under *Batson*, 476 U.S. at 79; 3) the wire and mail fraud statutes, as applied to Morris, exceed Congress's authority to legislate in violation of the Tenth Amendment; 4) the district court erred by not allowing the jury to view the live website at issue; 5) the district court erred in enhancing his base offense level by four points for his role as a leader or organizer of an activity involving five or more participants under U.S.S.G § 3B1.1 and by two points for the sophisticated-means enhancement under U.S.S.G. § 2B1.1(b)(9)(C); and 6) the district court's restitution

order improperly included restitution to an entity that was already receiving compensation from a settlement agreement.

## II. Appellants' Joint Claims

### A.   Sufficiency of the Evidence

Appellants contend that the evidence was insufficient to support their conspiracy, mail fraud, and wire fraud convictions.   Specifically, Louper-Morris states that the United States failed to prove that she harmed or intended to harm anyone, that she made material false representations or promises, and that she intentionally participated in a scheme to defraud.   Morris only contends that the United States failed to prove his intent to defraud.

We review de novo the sufficiency of the evidence to sustain a conviction. *United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010).  The evidence is viewed most favorably to the verdict, giving it the benefit of all reasonable inferences.  *Id*. Reversal is appropriate only where no reasonable jury could find all the elements beyond a reasonable doubt.  *Id*.  We do not weigh the credibility of the witnesses or the evidence. *Id*. "The jury has the sole responsibility to resolve conflicts or contradictions in testimony, and credibility determinations are resolved in favor of the verdict."  *Id*. (quoting *United States v. Honarvar*, 477 F.3d 999, 1000 (8th Cir. 2007)).

To prove conspiracy to commit wire fraud, the United States must show that 1) there was a conspiracy, an agreement to commit wire fraud; 2) Louper-Morris and Morris knew of the agreement; and 3) they intentionally joined in the conspiracy. *Johnson*, 450 F.3d at 374.  "The elements of conspiracy may be proved by direct or circumstantial evidence, and the jury may draw reasonable inferences from the evidence presented about what the defendant's state of mind was when he did or said

the things presented in the evidence." *United States v. Rodriguez-Ramos*, 663 F.3d 356, 361 (8th Cir. 2011) (quoting *United States v. Cervantes*, 646 F.3d 1054, 1059 (8th Cir. 2011)).

To establish mail fraud pursuant to 18 U.S.C. § 1341, the United States must prove: "(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud, (3) reasonable foreseeability that the mail would be used, and (4) [that] the mail was used in furtherance of some essential step in the scheme." *United States v. Bryant*, 606 F.3d 912, 917 (8th Cir. 2010) (quoting *United States v. Parker*, 364 F.3d 934, 943 (8th Cir. 2004)). "[T]o constitute mail fraud, a defendant's misrepresentations must be material." *Id*. at 917-18. "A misrepresentation is material if it is capable of influencing the intended victim." *Id*. at 918; *see also Preston v. United States*, 312 F.3d 959, 961 (8th Cir. 2002) (per curiam) (a material fact is "a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction").

The elements of wire fraud are virtually identical to mail fraud. To establish wire fraud pursuant to 18 U.S.C. § 1343, the United States needed to prove beyond a reasonable doubt that 1) Appellants joined a scheme to defraud; 2) they intended to defraud; 3) it was reasonably foreseeable that interstate wire communications would be used; and 4) the wires were, in fact, used. *Johnson*, 450 F.3d at 374.

Intent is an essential element of both wire fraud and mail fraud. *United States v. Flynn*, 196 F.3d 927, 929 (8th Cir. 1999) (wire fraud); *Bryant*, 606 F.3d at 917 (mail fraud). "Fraudulent intent need not be proved directly and can be inferred from the facts and circumstances surrounding a defendant's actions." *Flynn*, 196 F.3d at 929. Accordingly, the question before us is "whether the facts and circumstances of this case, viewed in the light most favorable to the jury's verdict, are sufficient to establish intent to defraud. . . ." *Id*. (quoting *United States v. Andrade*, 788 F.2d 521, 527 (8th Cir. 1986)).

Contrary to Louper-Morris's assertions, the United States is not required to show actual loss or harm to the victims of the fraud in order to prove wire fraud or mail fraud. *United States v. Williams*, 527 F.3d 1235, 1245 (11th Cir. 2008). Rather, "[t]he government merely needs to show that the accused intended to defraud his victim and that his or her communications were reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (internal citations and quotations omitted).

The record is replete with evidence of Appellants' intent to defraud the State of Minnesota, K-Mart, and CyberStudy customers through material misrepresentations. Appellants intended to deceive the Department of Revenue about the existence of a pool loan. Denita Hollie and Benita Williams testified that Appellants were intentionally obtuse in their representations of the loan and led the Department of Revenue to believe that Rev. McAfee through Salem, Inc., had loaned over four million dollars to CyberStudy customers. In truth, Rev. McAfee had only loaned CyberStudy less than $3000, and the pool loan did not exist. Appellants also forged signatures on power-of-attorney forms and directed Denita, Benita, and Jennifer Davis to do the same. Those forged forms were filed with customer's state tax returns thereby defrauding the Department of Revenue.

Appellants intended to deceive K-Mart. Lyman Locket testified that K-Mart entered into a contract with CyberStudy in which K-Mart would provide computers to CyberStudy customers at a reduced rate. Louper-Morris told Locket that CyberStudy had over 100,000 customers and that two other computer companies were currently providing computers to CyberStudy and deferring payment until the tax credit reimbursement was released from the State in the following tax year. Locket stated that K-Mart provided the computers believing that CyberStudy would provide a comprehensive educational tutorial to low-income individuals, which would further K-Mart's diversity initiative. Numerous individuals testified, however, that the tutorial lacked the advertised educational content. K-Mart also expected payment on

the computers once CyberStudy began receiving tax credit reimbursements. After Minnesota began depositing money in CyberStudy's bank account, Appellants never routed any of the funds to K-Mart. Locket's testimony is sufficient to show that Appellants intended to defraud K-Mart.

Perhaps Appellants' most egregious behavior in their fraudulent scheme was their joint intention to deceive CyberStudy customers, low-income individuals, many who did not speak English. Numerous CyberStudy customers testified that Appellants promised them a free computer. In fact, the computers were not free and required customers to sign a service contract with CyberStudy and to assign their tax credit refund to CyberStudy. CyberStudy customers testified that they were promised a comprehensive educational tutorial with material in four languages. That content never existed. Denita and Benita testified that Appellants had them prepare CyberStudy customers' tax returns for mailing on December 31, 2000 even though the CyberStudy contract stated that tax returns would not be filed until April 15, 2001. When Appellants did not receive the full tax credit amount, Appellants in many cases threatened legal action against the customers, including immigration enforcement.

Despite Appellants' repeated assertion that they were just trying to "break the digital divide" and educate low-income individuals, the trial testimony shows that Appellants intended to defraud others. The United States proved beyond a reasonable doubt that Appellants made material misrepresentations and intended to defraud the state of Minnesota, K-Mart, and CyberStudy customers. We conclude that evidence was sufficient to support Appellants' conspiracy, mail fraud, and wire fraud convictions.

B.      *Batson* claim

Appellants assert that the district court erred in overruling their objection under *Batson v. Kentucky*, 476 U.S. 79 (1986).  During jury selection, the United States used one of its peremptory strikes to strike juror number 41, an African-American, from the venire panel.  Appellants objected.  The following side-bar discussion occurred:

Mr. Kelly: Your Honor, defendants object to government's striking peremptory challenge of juror number 41.  The record should reflect that juror number 41 is the only African American left on this panel, and there is no, as far as the defendants are concerned, no justifiable reason for striking this juror other than race based.

Mr. Genrich: Well, Your Honor, clearly the issues in the case include both school and nonschool based education instruction and tutorial interactivity with respect to application of the education tax credit, which among other things has a prong related to whether tutoring services were provided by qualified instructors.

And we also struck, for example, juror number eight, who I will refer to as the Alabama juror, who indicated she had tutoring experience, and juror number [five] who worked in the special ed environment.

And we have a real concern that there could be a tendency among jurors, particularly those who have tutored children in school settings, to apply their own standards, their own legal standards or a matter of human nature their own experiential standards to the facts of the case.

And that was the primary basis certainly on which we struck juror number 41, and there was no race consideration to it.  In fact, we struck these other jurors for the same reason before we struck 41.

The Court: Anything else?

Mr. Kelly: No, Your Honor. Well, Your Honor, I think that there are, as the Court observed here, there are a number of jurors who are connected to the educational system in one fashion or another, and this particular juror is the only remaining African American. The Court excused one other gentleman, the school bus driver, for employment reasons.

And as coincidence, the only remaining potential juror, the only one that was not seated, is the only other African American that is here. So this gentleman, juror number 41, represents the sole member of the race of both of the defendants. We think it's important that the defendants have representation from their race.

Mr. Genrich: Your Honor, I would note with respect to the racial composition of the jury, that juror number 10 also comes from a community of color and was struck by the defense, and the fact that 41 would have been the only remaining juror of color, at least by my observation, is not solely exclusively a function of our strike.

The Court: Well, he does work in the educational setting. I understand the rationale for it, and while I certainly in the grand [scheme] of things would prefer to have a racially mixed jury, the Court finds that the government has stated a sufficient reason for their strike, which is not race based, but the issue is preserved if necessary for appeal.

The Equal Protection Clause of the Fourteenth Amendment prohibits the use of peremptory challenges to strike jurors solely on the basis of race. *Batson*, 476 U.S. at 86. In order to succeed on a *Batson* challenge, a party must satisfy a three-part test. *Id*. at 96. First, the objecting party must make a prima facie showing that a peremptory challenge is race based. *Id*. Then, the party seeking to strike the juror must show a race neutral justification that is "clear and reasonably specific" and related to the case to be tried in order to overcome the objection. *Id*. at 98 n.20. The

district court then decides whether the objecting party has shown purposeful discrimination in light of all the evidence. *Id*. at 98. [T]he critical question in determining whether [the objecting party] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003).

> [T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

*Id*. at 339. Because "those factual findings turn largely on credibility evaluations, they are due great deference[.]" *United States v. Allen*, 644 F.3d 748, 752 (8th Cir. 2011) (citing *Batson*, 476 U.S. at 98 n.21). Therefore, we review the district court's *Batson* ruling for clear error. *Id*.

"If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*' s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). In this case, however, the United States struck two other venire persons for the same reason as it struck an African American venire person: these individuals all worked in educational settings. The United States asserted that it was concerned that these individuals would apply their own educational standards to the case. The district court found that the United States exercised this strike for a legitimate reason. Reviewing the record, this finding is not clearly erroneous. Appellants' *Batson* challenge thus fails.

## III. Louper-Morris's Claims

### A.    Allegation of Material Misrepresentation to the Grand Jury

Louper-Morris alleges that the district court erred by denying Appellants' joint motion to dismiss the indictment because the United States allegedly made a material misrepresentation to the grand jury. "In reviewing the district court's denial of a motion to dismiss the indictment for alleged government misconduct, we review the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Pumpkin Seed*, 572 F.3d 552, 557 (8th Cir. 2009) (internal citations and quotations omitted).

Approximately two months after the deadline for filing pretrial motions, Appellants moved to dismiss the indictment. They alleged that the United States misinformed the grand jury by representing to the grand jury that no program materials or educational content existed on the CyberStudy website in 2000.

The magistrate judge heard oral arguments on the motion. It concluded that Appellants had no good cause for untimely filing the motion and also ruled that the motion failed on the merits. Specifically, the magistrate judge found that the record was devoid of any facts to support the proposition that the United States made any misrepresentations in the indictment or to the grand jury. Thus, the magistrate judge denied the motion.

We find no reversible error in the district court's denial of the dismissal of the indictment, "because even assuming that there were errors in the charging decision that may have followed from the conduct of the prosecution, the petit jury's guilty

verdict rendered those errors harmless." *Id.* (internal citation and quotation omitted).[6]

## B.    Prosecutorial Misconduct Allegation

Louper-Morris asserts that the district court erred in denying Appellants' joint motion for a new trial because the United States allegedly intimidated one of Appellants' witnesses thereby depriving her of the right to present a complete defense. We review a district court's denial of a motion for new trial for an abuse of discretion. *United States v. Perez*, 663 F.3d 387, 391 (8th Cir. 2011). "Reversal of a denial of a motion for new trial is rare." *Perez*, 663 F.3d at 39. (citation omitted).

In the motion for a new trial, Appellants alleged that Michelle Garcia-Strait, a potential defense witness, was intimidated by the United States. Garcia-Strait had sent a fax and an email to the district court describing her unplanned meeting with a governmental agent. The district court conducted an evidentiary hearing on the matter.

At the evidentiary hearing, Garcia-Strait testified to the following: on the day she was to testify, someone who she believed to be from the United States Attorney's office spoke with her in a conference room outside of the courtroom. The governmental agent summoned Garcia-Strait from the defense's conference room to the United States's conference room. The door was left partially open. For approximately five to ten minutes, the agent asked her about CyberStudy and some checks she had written. Garcia-Strait said that she felt intimidated by the experience. She did not recall telling either of Appellants' attorneys that she was intimidated or

---

[6] Moreover, we agree with the magistrate judge that the record is devoid of any facts that the United States made any misrepresentations in the indictment or to the grand jury.

unwilling to testify. When asked by the district court if the governmental agent had threatened her or told her not to testify, Garcia-Strait replied that the agent had not done either of those things. Garcia-Strait could not recall if Appellants' attorneys dismissed her before or after she had spoken with the governmental agent. She also indicated that Appellants were debating whether to call her to testify because of Garcia-Strait's pending felony fraud and forgery charges on which she could be cross examined. The following colloquy occurred between Garcia-Strait and Assistant U.S. Attorney Timothy Rank:

> Rank: You said that one of the things that [defense attorney] was trying to figure out was whether you would get cross-examined on those issues?
> Garcia-Strait: Correct. This is exactly why I was afraid to testify, yes.
> Rank: You were afraid to testify because you could get cross-examined on –
> Garcia-Strait: By you, yes.
> Rank: -- on issues related to your pending felony fraud and forgery charges?
> Garcia-Strait: Yes.

After the hearing, the district court issued an order denying the motion for a new trial. The district court expressly found that the United States did not threaten Garcia-Strait, and that Appellants chose not to call her as a witness. The district court noted that Garcia-Strait was concerned about testifying because she could be cross-examined about pending state court fraud and forgery charges. The district court concluded that there was not any impermissible governmental interference and a new trial was not warranted.

In light of the record, Louper-Morris's argument is unpersuasive. In fact, the record directly refutes her argument. The record clearly shows that Garcia-Strait was afraid to testify because of the possibility of being cross-examined on her pending fraud and forgery charges. Moreover, Garcia-Strait admitted that she was not threatened in any way or instructed not to testify. Garcia-Strait was available to testify, but Appellants' attorneys *chose* not to call Garcia-Strait as a witness. The United States's conduct did not prevent Garcia-Strait from testifying and, therefore, the United States did not compromise Louper-Morris's right to a fair trial. *See Dodd v. Nix*, 48 F.3d 1071, 1075-76 (8th Cir. 1995) (finding no due process violation when defense counsel chose not to call witness without consideration to the prosecution's conduct). The district court did not abuse its discretion in denying Appellants' motion for new trial on the ground of witness intimidation.

C.    Alleged Sentencing Error

Louper-Morris asserts that the district court erred by enhancing her base level offense by four points for her role as a leader or organizer of a criminal activity involving five or more participants under United States Sentencing Guidelines § 3B1.1.[7] She argues that the United States failed to prove by a preponderance of the evidence that one of the persons identified in the pre-sentence investigation report as a participant, Jennifer Davis, was criminally responsible for the offense.[8] Therefore, she contends that the district court erred in applying the leadership enhancement pursuant to § 3B1.1.

"When we review the imposition of sentences, whether inside or outside the Guidelines range, we apply 'a deferential abuse-of-discretion standard.'" *United*

---

[7] The district court relied on the 2010 version of the United States Sentencing Guidelines Manual.

[8] Louper-Morris does not challenge her role as a leader of the criminal activity.

*States v. Hayes*, 518 F.3d 989, 995 (8th Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). "In reviewing for procedural error, we review the district court's application of the [G]uidelines *de novo* and its factual findings for clear error." *United States v. Bennett*, 659 F.3d 711, 714 (8th Cir. 2011) (citations & quotation omitted). "'Procedural error' includes 'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.'" *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quoting *Gall*, 552 U.S. at 51).

United States Sentencing Guidelines § 3B1.1(a) states, "Based on the defendant's role in the offense, increase the offense level as follows: (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." (emphasis omitted). In order for the district court to apply the § 3B1.1(a) leadership enhancement, the United States needed to prove by a preponderance of the evidence that Louper-Morris led or organized five or more participants in the CyberStudy fraud or that the organization was otherwise extensive. *United States v. Cosey*, 602 F.3d 943, 947-48 (8th Cir. 2010); *United States v. Rodriguez-Ramos*, 663 F.3d 356, 365 (8th Cir. 2011) (stating burden of proof). "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1.

The record conclusively shows that five or more individuals were participants within the meaning of U.S.S.G. § 3B1.1. Denita Hollie testified Louper-Morris was the leader of five or more "criminally responsible" individuals. She stated that in addition to herself, Benita Williams, Morris, and Jennifer Davis all forged signatures on the power-of-attorney forms in order for CyberStudy to receive the tax credit. Benita Williams corroborated this testimony. Cheryl Cardinal also testified that she

left the employment of CyberStudy because she no longer felt comfortable "marketing something that wasn't there"—that is, marketing CyberStudy 101 even though it lacked educational content. Denita Hollie, Benita Williams, and Cheryl Cardinal's testimony all prove that Louper-Morris was the leader or organizer of five or more participants who committed fraud either through forging signatures or marketing CyberStudy 101's nonexistent educational content.

The leadership enhancement is also appropriate if the United States proves by a preponderance of the evidence that the organization "was otherwise extensive." U.S.S.G. § 3B1.1(a). A four-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(a) is appropriate if the trial testimony shows that "the criminal activity was otherwise extensive." *See United States v. Brown*. 627 F.3d 1068, 1073 (8th Cir. 2010) (internal quotation omitted). "In accessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 cmt. n.3.

Regarding the leadership enhancement, the district court stated:

As to the leadership role, I think there were many participants here. I don't know that we need to count to only five. There are many who participated in one way or another to encourage people to participate in this program, and I think the evidence was clear on that. So the four-level increase as a leader and organizer is appropriate in this case.

We construe the district court's statement as a finding that it believed not only that the CyberStudy fraud involved more than five participants, but that the criminal activity was otherwise extensive. The criminal activity "was otherwise extensive" in that Louper-Morris recruited numerous individuals to assist in CyberStudy's customer

recruitment and tax form preparation. In addition, Rev. McAfee provided "unknowing services" for CyberStudy by acting as a front for the pool loan. Therefore, we conclude that the district court did not err in applying a four-level leadership enhancement to Louper-Morris's sentence pursuant to U.S.S.G. § 3B1.1(a) because the criminal activity was otherwise extensive.

D.    Claim of Cumulative Error

Lastly, Louper-Morris contends that cumulative trial errors warrant reversal or, at least, remand. "We may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." *United States v. Montgomery*, 635 F.3d 1074, 1099 (8th Cir. 2011) (quoting *United States v. Samples*, 456 F.3d 875, 887 (8th Cir. 2006)). We have painstakingly considered the record and find that there is not even a specter of unfairness much less any deprivation of Louper-Morris's constitutional rights. Any error was harmless error. Louper-Morris's claim of cumulative, reversible error is without merit.

## IV.  Morris's Claims

A.    Tenth Amendment Claim

Morris argues that the wire and mail fraud statutes, as applied to him, exceed Congress's authority to legislate in violation of the Tenth Amendment. Morris raises this constitutional challenge for the first time on appeal. Defenses not raised or litigated in the district court normally cannot be argued for the first time on appeal. *Gardner v. Meyers*, 491 F.2d 1184, 1190 (8th Cir. 1974). "This rule, however, is one of prudence and discretion." *Ward v. Resolution Trust Corp.*, 972 F.2d 196, 199 (8th Cir. 1992).

Typically, constitutional challenges to the charging statute can be raised during pretrial motions, specifically, in a motion to dismiss the indictment. *E.g. United States v. Smith*, 655 F.3d 839, 848 (8th Cir. 2011) (reviewing claim when defendant raised constitutional challenge in a motion to dismiss the indictment). In this case, presenting this argument to the district court would have been futile because, at the time, this Court denied "Tenth Amendment prudential standing to individuals 'absent the involvement of a state or its instrumentalities.'" *Id.* (quoting *United States v. Hacker*, 565 F.3d 522, 526 (8th Cir. 2009)). However, the Supreme Court recently held that criminal defendants may challenge statutes as violative of the Tenth Amendment. *Id.* (citing *Bond v. United States*, --- U.S. ----, 131 S.Ct. 2355, 2366-67 (2011)). Morris did not have prudential standing until after the *Bond* decision conferred it upon him, and accordingly, he could not make this constitutional challenge to the charging statute. Therefore, we will address the merits of his argument.

We review federal constitutional questions, such as whether Congress had the power to enact a statute, de novo. *United States v. Sabri*, 326 F.3d 937, 945 (8th Cir. 2003).

The Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. A Tenth Amendment challenge to a statute "necessarily" fails if the statute is a valid exercise of a power relegated to Congress. *United States v. Wright*, 128 F.3d 1274, 1276 (8th Cir. 1997) (finding challenged statute to be valid exercise of Congress's power to regulate commerce).

Article I, Section 8, Clause 7 of the United States Constitution authorizes Congress "To establish Post Offices and post Roads[.]" The Postal Power allows Congress to regulate the entire postal system. *Ex Parte Rapier*, 143 U.S. 110, 113

(1892). "The overt act of putting a letter into the post office of the United States is a matter that Congress may regulate. . . . Whatever the limits to its power, it may forbid any such acts done in furtherance of a scheme it regards as contrary to public policy, whether it can forbid the scheme or not." *Badders v. United States*, 240 U.S. 391, 393 (1916) (internal citation omitted). Congress's Postal Power provides the jurisdictional basis for 18 U.S.C. § 1341, the mail fraud statute. *United States v. Elliott*, 89 F.3d 1360, 1364 (8th Cir. 1996). Thus, Morris's Tenth Amendment challenge to the mail fraud statute "necessarily" fails because the mail fraud statute is a legitimate exercise of Congress's Postal Power. *Wright*, 128 F.3d at 1276.

Regarding Morris's challenge to the wire fraud statute, 18 U.S.C. § 1343, Morris ignores Article I, Section 8 of the United States Constitution, the Commerce Clause, as a source of legislative authority. "[Section] 1343 [is] within the extensive reach of the Commerce Clause." *United States v. Hook*, 195 F.3d 299, 310 (7th Cir. 1999). Therefore, Morris's Tenth Amendment challenge to the wire fraud statute also "necessarily" fails. *Wright*, 128 F.3d at 1276.

B.    Evidentiary Ruling Error

Morris asserts that the district court erred by not allowing the jury to view the live CyberStudy website thereby denying him his Fifth and Sixth Amendment right to a complete defense. "We review a district court's evidentiary rulings for clear abuse of discretion, reversing only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." *United States v. Watson*, 650 F.3d 1084, 1088 (8th Cir. 2011) (quoting *United States v. Shields*, 497 F.3d 789, 792 (8th Cir. 2007)).

At the beginning of the trial, Louper-Morris requested permission to introduce the 2010 version of the online CyberStudy tutorial during her testimony. The district court deferred the ruling until Louper-Morris was to testify. The district court again

raised the issue before Louper-Morris's opening statement.[9] It instructed counsel that any demonstration of the tutorial should be done through "screen shots that can be moved to on a shot by shot basis, much like clicking onto another site on the Internet." The district court expressed concern about the jury's access to exhibits and opined that the screen shots would enable the jury to review the exhibit at a later time. Thus, the district court excluded admission of the live website. The United States argued that the screen shots would not be representative of the website during the relevant time period, 2000-2002. The district court noted the concern and stated that the issue would be taken up later. Neither Louper-Morris nor Morris sought admission of a screen-shot exhibit.

The district court did not abuse its discretion in precluding admission of the live 2010 CyberStudy website. First, the district court was clearly concerned about the jury's access to exhibits, which is a legitimate reason to change the format of the evidence. Second, Morris has not demonstrated how a screen-shot exhibit is inferior to live website or how a screen-shot exhibit is prejudicial to him. Third, we cannot ignore the fact that once the district court ruled to allow only the screen-shot exhibit, Appellants abandoned their efforts to proffer any representation of the CyberStudy website for the jury's viewing. Finally, Appellants sought admission of the 2010 website, which, as the United States pointed out at trial and on appeal, would have limited probative value of the 2000-2002 website. In light of the overwhelming evidence against Appellants and the limited relevance of the 2010 CyberStudy website, the district court did not abuse its discretion in denying admission of the live 2010 website.

---

[9] Louper-Morris had deferred her opening statement until after the United States had presented its case.

C.    Sentencing Error

Morris contends that the district court improperly applied the two-level sophisticated-means enhancement under U.S.S.G. § 2B1.1(b)(9)(C) and the four-level leadership enhancement under U.S.S.G. § 3B1.1(a). We apply "a deferential abuse-of-discretion standard" when reviewing the imposition of sentences. *Gall v. United States*, 552 U.S. at 41. "In reviewing for procedural error, we review the district court's application of the [G]uidelines *de novo* and its factual findings for clear error." *Bennett*, 659 F.3d at 714 (citations & quotation omitted).

Under the sophisticated-means enhancement, a defendant's base offense level may be increased by two levels if "the offense otherwise involved sophisticated means." U.S.S.G. § 2B1.1(b)(9)(C). "Sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1(b)(9)(C) cmt. n.8(B). The sophisticated-means enhancement is appropriate when the offense conduct, viewed as a whole, "was notably more intricate than that of the garden-variety [offense]." *United States v. Hance*, 501 F.3d 900, 909 (8th Cir. 2007). "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." *United States v. Fiorito*, 640 F.3d 338, 351 (8th Cir. 2011) (quoting *United States v. Bistrup*, 449 F.3d 873, 882 (8th Cir. 2006)).

Morris does not dispute the district court's factual findings that formed the basis of the sophisticated-means enhancement. Rather, he contends that the district court erred in its legal conclusion that the fraud was sophisticated. We disagree. The CyberStudy fraud involved a vast marketing scheme that included mobilizing various community leaders. It involved lobbying state agencies including the Minnesota Department of Revenue and the Minnesota Attorney General. The fraud required the preparation of thousands of tax returns and power-of-attorney forms, endorsed with fraudulent signatures. *Cf. United States v. Septon*, 557 F.3d 934, 937 (8th Cir. 2009)

(affirming application of the sophisticated-means enhancement where a scheme involved "submitting numerous loan applications to lenders containing forged signatures, forged notary stamps, and falsified or altered [documents]"). Finally, the fraud required the creation of a fake pool loan allegedly financed by Rev. McAfee's organization, Salem, Inc. This coordinated conduct amounts to a sophisticated scheme. The district court did not err in applying the sophisticated-means enhancement.

Morris also argues that the district court erred in applying the four-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(a) because he was "at worse, . . . a manager or supervisor of the scheme[,]" and his mother, Louper-Morris, was the true leader and figurehead of the organization. The district court considered and rejected this argument. It stated:

> As to the leader or organizer objection relative to paragraph 42, the Court will overrule the defense objection. I have considered this carefully and considered dropping this to an organizer or a manager, I guess, rather than a leader/organizer which would be three points, but having once again gone through the nature of the role that was played by Mr. Morris in this, I just find that I cannot change that recommendation that the probation office has made.

A leadership role is determined by "the nature of defendant's role in the offense, the recruitment of accomplices, the degree of participation in planning or organizing the offense." *United States v. Williams*, 605 F.3d 556, 570 (8th Cir. 2010) (quoting *United States v. Ortiz-Martinez*, 1 F.3d 662, 677 (8th Cir. 1993)). A defendant's "decision-making authority. . . and the degree of control and authority that the defendant exercised over others" is indicative of whether the defendant had a leadership role in the offense. *Id.* (quoting *United States v. Del Toro-Aguilera*, 138 F.3d 340, 342 (8th Cir. 1998)). The leadership enhancement "does not apply solely

-34-

to those who first instigated the criminal activity, and the defendant need not be the only organizer or leader." *United States v. Bolden*, 596 F.3d 976, 984 (8th Cir. 2010).

Like the district court, we disagree with Morris's characterization of his role in the CyberStudy fraud. Denita Hollie testified that Morris had a leadership position with CyberStudy. She stated that although he did not generate many of the ideas that propelled the scheme, he helped implement Louper-Morris's ideas by instructing employees. Morgan Brown, Denita Hollie, Benita Williams, and Lyman Locket each testified that Morris acted as CyberStudy's attorney. As the company's attorney, he had a degree of authority. He drafted all of the legal documents for the organization including customer agreements and letters threatening collection actions and immigration actions. He also negotiated the K-Mart–CyberStudy computer contract. Carlos Granados testified that Morris was also in charge of all banking for the company. Lastly, Morris, like Louper-Morris, took a substantial amount of money from CyberStudy's bank account for personal use. These facts support the district court's determination that Morris was a leader or organizer within the context U.S.S.G. § 3B.1.1(a). The district court did not err by enhancing Morris's sentence by four levels for his leadership role.

D.    Restitution Issue

Morris argues that the district court's restitution order improperly included restitution to K-Mart, who was already receiving compensation from a settlement agreement. He asserts that the restitution order improperly "doubly compensates" K-Mart through the civil settlement and criminal restitution.

After a few years of litigation, CyberStudy entered into a settlement agreement in which it was to pay K-Mart $610,000 in compensation for breaching the computer contract. CyberStudy failed to make any payments and, in October 2003, a judgment

for $1,211,134.03 plus interest and attorney's fees was entered against CyberStudy for this failure. In this criminal case, the district court imposed mandatory restitution in the amount of $3,562,502.74—$2,351,368.71 owed to the Minnesota Department of Revenue and $1,211,134.03 owed to K-Mart. Appellants were held jointly and severally responsible for the restitution payments. Morris admitted on cross-examination that Appellants had not paid any amount on the civil judgment.

Ordinarily, we review restitution awards for an abuse of discretion. *United States v. Jefferson*, 652 F.3d 927, 932 (8th Cir. 2011). Morris, however, did not challenge the restitution order at sentencing. We therefore review the restitution order for plain error. *United States v. Piggie*, 303 F.3d 923, 928 (8th Cir. 2002); *United States v. Riebold*, 135 F.3d 1226, 1231 (8th Cir.1998). Plain error review is "extremely narrow and is limited to those errors which are so obvious or otherwise flawed as to seriously undermine the fairness, integrity, or public reputation of judicial proceedings." *Piggie*, 303 F.3d at 928 (quoting *United States v. Beck*, 250 F.3d 1163, 1166 (8th Cir. 2001)).

The Mandatory Victims Restitution Act (MVRA), 18 U.S.C. §§ 3663A - 3664, requires individuals who are convicted of wire fraud to pay restitution to their victims. *United States v. Mancini*, 624 F.3d 879, 882 (8th Cir. 2010); 18 U.S.C. § 3663A(c)(1)(A)(ii) (ordering mandatory restitution for victims of "an offense against property under this title, . . . including any offense committed by fraud or deceit"). The MVRA instructs that, "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in-- (A) any Federal civil proceeding[.]" 18 U.S.C. § 3664(j)(2)(A). Although the purpose of the MVRA is to make victims whole and compensate them for their losses, *United States v. Frazier*, 651 F.3d 899, 904 (8th Cir. 2011), the MVRA does not allow victims to obtain double recovery or a windfall through restitution. *Id.* at 910-11; *United States v. Ruff*, 420 F.3d 772, 775 (8th Cir. 2005) (*Ruff I*); see also *United States v. Manzer*, 69 F.3d 222, 230 (8th Cir. 1995)

(finding that the MVRA's precursor, the Victim and Witness Protection Act of 1982, does not allow "double recovery for the same loss through both a restitution order and a civil judgment"); *United States v. Gaultier*, 727 F.2d 711, 716 (8th Cir. 1984).

Nevertheless, Morris's argument is without merit. By Morris's own admission, K-Mart has yet to receive any payments in satisfaction of the civil judgment. Therefore, Morris has failed to show that enforcement of the restitution order would result in double recovery for K-Mart. *Cf. United States v. Ruff*, 472 F.3d 1044, 1047 (8th Cir. 2007) (*Ruff II*) (finding that the district court did not plainly err in denying Ruff's request to offset the restitution amount with the forfeiture proceeds in part because Ruff did not show that the victim was receiving double recovery). If either Appellant begins to make payments on the civil judgment, either he or she may seek in the district court a reduction of the restitution order to credit or offset amounts recovered by K-Mart. *Frazier*, 651 F.3d at 910-11; *Manzer*, 69 F.3d at 230; *Gaultier*, 727 F.2d at 716. Absent evidence of a double recovery, we can say that the district court did not plainly err in awarding restitution to K-Mart even though K-Mart can enforce a civil judgment against Appellants.

## V. Conclusion

For the foregoing reasons, we affirm the judgment of the district court and Appellants' sentences.

_____